# WILLIAM M. ROSS & CO.

## *v.*

# ADAM G. INNIS.

35   487
31a 592

35   487
33a 250

35   487
144   87

35   487
51a 469

35    487
100a ²389
101a ⁶271
35    487
e115a³243

1. MALICIOUS PROSECUTION — *what is probable cause.* Probable cause is defined to be a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.

2. SAME — *want of probable cause a material element.* The want of this element, probable cause, is the main ground of an action for malicious prosecution, and must be clearly shown.

3. SAME — *burden of proof.* The *onus* is upon the party bringing the action, to show that the criminal prosecution was the offspring of malice and without any probable cause to justify it, — that the prosecutor had no sufficient reason to believe the accused guilty.

4. SAME — *of malice, as an element — and of the presumptions therefrom.* If probable cause for the arrest exists, malice on the part of the prosecutor cannot be considered — it weighs nothing. Though malice may be inferred from the want of probable cause, a want of probable cause cannot be inferred from malice.

5. SAME — *proof of good character of accused, its effect.* Among the circumstances tending to show a want of probable cause, the good character of the party accused would stand out prominently. That is a strong fact, if known to the accuser, to ward off suspicion, — to weaken a belief, he being a prudent and cautious man, in the guilt of the suspected party.

6. SAME — *where the accuser acts under advice of counsel.* If a person, with an honest wish to ascertain whether certain facts will authorize a criminal prosecution, lays all the facts before one learned in the law, and asks his deliberate opinion thereon, and the advice obtained is favorable to the prosecution, it will go far, in the absence of other facts, to show probable cause, and to negative malice, in an action for malicious prosecution.

7. But if it appears that the party withheld material facts within his knowledge, or which in the exercise of common prudence he might have known, the opinion which he invokes in his defense cannot avail him.

8. EXCESSIVE DAMAGES — *in cases of tort.* Apart from the principle that courts seldom disturb verdicts on the ground of excessive damages, after three trials, having the same result, it must be a very strong case indeed in which the appellate court, in an action sounding wholly in damages, will interpose to set the verdict aside.

9. A verdict should not be disturbed on account of excessive damages in cases of tort, unless it be probable from the amount of the damages assessed, that the jury has acted under the influence of prejudice or passion.

10. EMBEZZLEMENT — *what constitutes.* The cashier of a mercantile house, having charge of the money of the concern, being about to leave their employment, took of the money of the firm in his hands the amount due him as the balance of his salary, without the knowledge and against the wish of his employers, and charged the same to himself on their books. *Held,* that the employé was not guilty of embezzlement, and did only what he had a right to do.

APPEAL from the Superior Court of Chicago.

This was an action on the case instituted in the court below by Adam G. Innis against William M. Ross and John H. Ross, who composed the firm of Wm. M. Ross & Co., trading and doing business in the city of Chicago. The ground of the action was the alleged malicious prosecution of the plaintiff by the defendants, upon a charge of embezzlement, upon which he was examined and acquitted.

This was the third trial before a jury, all resulting in verdicts for the plaintiff for heavy damages. The first verdict was set aside in the court below; the judgment on the second was reversed in this court at the April Term, 1861, and the cause remanded. It will be found reported in 26 Ill. 259. The third trial was had at the June Term, 1863, of the Superior Court. The following is, substantially, the evidence adduced on the trial: *Samuel Strauss* testified on behalf of the plaintiff, that, on the 27th of December, 1859, William M. Ross, one of the defendants, came before him as a notary public, and signed, and was sworn to, an affidavit which was shown the witness. Robert S. Blackwell, Esq., an attorney-at-law, was with Mr. Ross at the time; and it was admitted that the affidavit was in Mr. Blackwell's hand writing.

The affidavit was then given in evidence, and is as follows:

STATE OF ILLINOIS, } ss.
    COOK COUNTY,    }

*William M. Ross,* one of the firm of William M. Ross & Co., a mercantile copartnership in the city of Chicago, in said county and State, composed of the said William M. Ross

and John H. Ross, being duly sworn, on his oath deposes and says, that, on the 29th day of September, 1855, the said firm of Wm. M. Ross & Co., employed in their said service one Adam G. Innis as their cashier, and the said Adam G. Innis continued in their said employment as such cashier from the said 29th day of September, 1855, until and including the 12th day of December, 1859. And this affiant further deposes and says that it then and there became and was, and continued to be, during the said service or employment of the said Adam G. Innis, his duty to receive, safely keep, and disburse all moneys which came to the possession of the said William M. Ross & Co., for the use and benefit of the said William M. Ross & Co., and under their directions and in pursuance of their orders.

And affiant further deposes and says, that by means of the premises the said Adam G. Innis then and there became and was the servant, clerk or agent of the said Wm. M. Ross & Co. And affiant further deposes and says, that afterwards, and during the continuance of the said employment, the said Adam G. Innis was intrusted by the said Wm. M. Ross & Co. with the sum one of hundred and sixty-six dollars in bank bills or notes, upon various banks and of various denominations, which are severally unknown to this affiant and to his said firm; and that afterwards, to wit, on the 12th day of December, 1859, the said Adam G. Innis did, then and there, without the knowledge or consent of the said Wm. M. Ross & Co., and against their will, feloniously convert and appropriate to his own use, and embezzle from the said William M. Ross & Co., with intent then and there to steal the same, the said sum of one hundred and sixty-six dollars, which said sum of one hundred and sixty-six dollars in bank bills or notes, was then and there the property of the said William M. Ross & Co., contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the said State of Illinois; and further this deponent saith not.

                    (Signed)  ·                    W. M. ROSS.
    Sworn to, &c.

It appears, from the testimony of *J. L. Milliken*, that this affidavit was presented to him, as a justice of the peace of Cook county, by Mr. Blackwell, who requested him to issue a warrant upon it for the arrest of Innis. A warrant was accordingly issued by the justice, and placed in the hands of an officer, who arrested Innis the same day. Innis, as required by the justice, gave bail for his appearance at a subsequent day. A few days after his arrest, Innis was again brought before the justice for examination, when witnesses were examined, and an investigation resulted in the discharge of the prisoner. Both of the defendants testified upon that examination, as well as several others. One of the defendants, in giving his testimony on that occasion, stated that there was an arrangement between Innis, the plaintiff, and the defendants, by which Innis assumed a portion of a debt, to the extent of about $200, which his brother had contracted with the house of Ross & Co., and that it was charged to Innis on their books by his consent; that a portion of his salary was to be reserved from month to month for the purpose of paying the same. It was further stated on that examination, by one of the defendants, as the witness thinks, that the plaintiff Innis had been the assignee of his brother Alexander, whose debt it was claimed he had assumed. The justice discharged Innis, because the proof failed to establish an intent to steal.

*William M. Douglass* testified, that he was the officer to whom the warrant was given for the arrest of Innis. After the warrant was placed in his hands, he went to the store of the defendants and told them he did not know Innis, and they must show him; they sent a boy with the officer to where Innis was staying, to point him out; Innis was not there, but on his return the officer saw him and arrested him. This was about six o'clock in the evening, and Innis was in custody until about eleven o'clock at night, when he gave bail for his appearance before the justice at a subsequent day. This witness also stated that immediately after the discharge of the plaintiff by the justice, one of the defendants, William Ross, told Innis that he was a scoundrel; that he was dishonest, and

if he got any other place he would injure him, and have him discharged.

*George Kennedy* testified that he was the book-keeper of the defendants on the 10th of December, 1859, and had been employed in that capacity for about eight years. Innis, the plaintiff, was in the employment of the same house at the time mentioned, in the capacity of cashier, and had been for about four years previously. In regard to the transaction immediately involved in this suit, the witness stated: It was my business to make up the accounts of persons belonging to the establishment. On the Saturday evening previous to Mr. Innis' leaving, he came to me and told me was going to Hannibal to attend a law suit, and asked me for a statement of his account. He said he was going to Hannibal on the Monday following, and as he had received notice from Mr. Ross that his services would not be required after the 1st of January, in that case he did not think it worth his while coming back. I gave him a statement of the account out of the books, and found according to the books that he was in debt about $78. He said it could not be so, there must be some mistake about it—there must be between $100 and $200 due to him. I showed him about the charge of his brother, and he told me he had never agreed to pay it out of his salary,—he had agreed to pay it out of that *insurance money*. William Ross at that time was in New York. John H. Ross was in the country. I advised Mr. Innis to remain until Monday and see John H. Ross. He did remain, and worked all day Monday, and that is all I know about it. I was not present Monday evening when he left.

The witness stated that he made the charge of Alexander Innis' debt against the plaintiff. The amount was $241.04, and the charge was entered 31st October, 1859. The witness testified on this subject as follows: I was ordered to make the charge by William Ross; I did not ask Mr. Innis, the plaintiff, whether I should make it; I did not inform him of the charge having been made until I rendered the account on the 10th of December; nor do I know that he had any notice or knowledge of it until that time; excluding that charge, the balance

due to Mr. Innis on the 10th of December, 1859, was $166; Mr. Innis was in charge of the moneys of the concern at that time; it was his duty to receive and pay it out as cashier; there was money in Mr. Innis' possession, in the desk, on that Saturday evening, the proceeds of the day; and he had, as cashier, the custody of the money during the following Monday; the average daily cash sales about that time was about $1,500, and during the four years of Mr. Innis' employment I should think that would be about the average.

The witness further testified: It was my duty, as bookkeeper, to transfer to the general books of the concern, — the journal, ledger, and cash book — the entries I found made in the sales book by Mr. Innis and the other clerks; on the 13th of December I found in the sales book an entry made by the plaintiff, as follows: "A. G. Innis, $166;" that was the first time I saw it; I carried it through the general books with the other entries of the same day; some ten or twelve days afterwards William Ross returned from New York, and upon being informed of that entry, directed me to erase it, which I did.

The salesmen were paid every alternate Saturday; I made up the pay rolls, showing what was due to each salesman, and they were paid accordingly; the aggregate amount was drawn for and paid out to them severally; my name was not on the pay rolls, nor was Mr. Innis': we were paid as we wanted it; could draw for it; when I wanted money, sometimes I got it by check, and sometimes from Mr. Innis at the desk; when I got a check, it was signed by Mr. William Ross if he was present, and in his absence it was signed by Mr. Innis and indorsed by John H. Ross; I have seen money charged to Mr. Innis in his own hand writing on other occasions than that of $166; I knew Alexander Innis; previous to the summer of 1858 he was doing business in Quincy; he was a customer of the firm of William M. Ross & Co.; his dealings were to a considerable amount; the balance due on his account was struck, as appears from the ledger, on 31st October, 1859; the entry on that day was, "By Adam G. Innis, $241.04;" the date

of the last entry of goods to Alexander Innis was July 30th, 1858; the date of the last credit previous to October 31, 1859, was June 16th, 1858; there were no goods furnished to him after July, 1858, and no payments made by him after June, 1858, till this credit or charge to Adam Innis.

, At the time of the transaction, in December, the only persons authorized to draw checks were Mr. William Ross and Mr. Innis with Mr. John H. Ross' indorsement. Mr. John Ross did not then have authority to draw checks in the name of the firm. Mr. Innis had drawn checks in the manner indicated in many instances.

Mr. John H. Ross was in the store on the 12th of December, the date of the entry in the sales book by Mr. Innis to himself of the $166, and also on the day following. No objection was made to the entry at that time. I made no remark about it, and received no directions concerning it at that time.

I recollect Mr. Blackwell coming to the store and asking me questions about this transaction; at that time these entries of the $166, to Mr. Innis, were erased.

. In answer to a question on the subject of a conversation with one of the defendants, in regard to the witness' testimony in this case, he stated: On the morning the second trial came on, or was to come on, Mr. Ross called me and stated to me that he had been advised by Mr. Merrick and Mr. Van Buren to discharge me from his employment, on account of the evidence I gave. I told him I had only told the truth, and *that* I was bound to do whatever the consequences might be. That was all he said about discharging me, and that he thought he would tell me so that I might know what to expect. That was before I gave my testimony on the second trial. I have given my testimony on all the trials, and substantially as I give it now.

The witness stated that it was a general rule of the establishment that no sum exceeding five dollars should be drawn except upon checks, but stated, and it so appeared from the books, that this rule was often violated, not only in the payment of freight, express charges &c., but in payments to the

clerks in the house, and in several instances, to the witness and the plaintiff himself, and sometimes to the defendants.

The five dollar rule mentioned, embraced every person to whom money might be paid, including the members of the firm.

At the time the witness testified upon this trial he was not in the employment of the defendants.

*Adam Murray* testified on behalf of the plaintiff, as follows: I know the parties to this suit; they are nephews of mine; the plaintiff and the defendants are first cousins. I recollect the occurrence of Innis, the plaintiff, paying himself $166, in December, 1859. Shortly after Innis left Rosses', I received a note from John H. Ross, saying he wanted to see me on very particular business immediately. I immediately went over to the store and met John, who told me that Adam Innis had taken $166 from the desk,—that it was the same as stealing it, and he was resolved on prosecuting him criminally for it. I was surprised, and said there surely must be two ways of telling that story. He said if I thought he lied about it, to walk up to the desk and see what Mr. Kennedy and the other clerks said about it. I declined going to the desk, and I said I would get the facts from Adam Innis himself. He then said he had a telegraph from his brother from New York, requesting him to arrest Innis if he did not pay back that money. I said I had not seen him for several days. He said, "I will bring him back if he should go to Texas." I said, "You need not go as far as that, you will find him at his father's house." "Well," said he, "you had better see him and tell him I will have him arrested if he does not pay it back." In the course of two or three days I saw Adam Innis and told him what John Ross threatened to do. Adam told me to tell John Ross he would not pay back that money; that he took it as the balance of salary due and coming to him, no more, and to remind John Ross that when he did take the money he had told him of it, and charged himself with the money upon their books; and as to attempting to arrest him, they could not do it without swearing falsely, and if they did

he would take them up for it. I stated this to John Ross, and he said, "I will arrest him in a short time, and we will see how he will like to be sent to Joliet." I warned John Ross, and said he had better be cautious; that by arresting him he might place him in a better position than he was in before. John said, "Nonsense, how could he fight such a house as this?" Said I, "I have seen such things before, and if it were myself, the bigger the house the better."

At this time, William Ross was in New York, but about ten days after these interviews with John Ross, I saw William in the store. He told me that Adam Innis had had the presumption to take $166 from the desk against the well known regulations of the store, and that he was resolved to make an example of him; he would let him see if he could play such tricks with him with impunity, and that if he did not pay it back he would ruin him — he would make him — that he would never get a situation in Chicago as long as he lived. I said that I did not know how he could do that. Said he, "I will arrest him and take him before a police magistrate, and if I don't indict him there, I will send him before the grand jury." Said I, "what do you want him to do?" He answered, "I want him to pay back that money." I said, "if you like, I will see Adam Innis once more." He said, "do so, and tell him my determination."

A few days after this, I saw Adam Innis, and told him what William Ross was determined to do if he did not pay back that money. I tried to convince him that no long services or relationship would prevent Ross from ruining him if he did not pay back the money. He said, no threats should compel him to pay back what was justly his own, no matter what quarter they came from; that he only took what was due to him, and no more; that the money he had taken was merely the balance of salary coming to him, and to remind Ross that he never promised to pay the balance of his brother's account, that, whatever passed on that subject depended upon the proceeds of his brother's assignment, and did not amount to a promise.

I told this to William Ross, and he replied that he would soon bring him to his senses. This was several days before the arrest. I do not remember that I told Innis this last remark of Ross, that he would soon bring him to his senses.

I knew of Innis' arrest afterwards, at the instance of Ross. I became his bail for his appearance before the magistrate, and was present at the examination. Both the defendants were examined as witnesses. The result of the investigation was the discharge of Innis.

Just before the case was called, John Ross called me aside, and asked me if it would not be better to compromise this matter before it was exposed to the world. I told him that he must go on with it now; that Adam Innis would not compromise the matter now; that he must just take the odium of his own doings against my advice. After Innis was discharged, at the time, and in the magistrate's office, I heard William Ross say, if any body came to him and asked him of Adam Innis' character, he would tell them that he stole $166 from him, and that he was a liar and a thief.

Cross-examination by Mr. Merrick:

*Interrogatory.* You say you went bail for Adam Innis?

*Answer.* Yes, sir.

*Int.* Did you ever go bail for him before?

*Ans.* I do not remember.

*Int.* Did you go bail when he was arrested for arson?

*Ans.* I do not remember that I did.

*Int.* Was he ever arrested for arson?

*Ans.* Not that I remember.

*Int.* Was he ever put to jail for anything you went bail for?

*Ans.* No, sir; I never heard of such things at all.

*Int.* What is your relationship to the defendants in this case?

*Ans.* They are both nephews of mine.

*Int.* Do you speak to them?

*Ans.* Certainly I do.

*Int.* Is there any intercourse between you at all?

*Ans.* Certainly; I am in Rosses' store when I want anything there, and buy there as soon as any other place.

*Int.* Perfectly kind, your relations, then ?

*Ans.* I have no quarrel with the Rosses.

*Int.* Perfectly kind ?

*Ans.* Yes, sir.

*Int.* Did you ever write to New York, at the time the Messrs. Ross started business here, advising parties there not to give them credit ?

*Ans.* I never did that, Mr. Merrick, to them nor anybody else, and I am astonished at such questions; I would help them rather than otherwise; the Rosses know that I indorsed for them much more than I ever did for Innis, and such questions don't become you, sir.

*Int.* What do you understand by indorsing for them ?

*Ans.* I indorsed bail for them.

*Int.* What kind of bail was it ?

*Ans.* The Rosses can tell you.

*Int.* I ask you.

*Ans.* The kind of bail was a case they had in court, and they had to give bail for $10,000, and I was one of the sureties.

*Int.* You never indorsed any notes for them ?

*Ans.* I never indorsed notes for them. What is the difference? I will indorse again if they ever request it.

*Mr. Galt*, one of the counsel for the plaintiff, stated that Mr. Hervey, of the firm of Hervey, Anthony and Galt, appeared as counsel for Mr. Innis upon his examination before the magistrate, for which Mr. Innis paid them a fee of $25.

*Alexander Innis* testified on behalf of the plaintiff, as follows: I am a brother of the plaintiff. I had quite a number of transactions with the defendants in purchasing bills at different times, while I was doing business at Quincy. The aggregate amount of my purchases was, I think, about $4,000. I commenced dealing with them in 1856, and ceased to do business in September, 1858. I failed in business, and made an assignment to my brother, the plaintiff. I was never asked, upon any occasion, by the defendants or either of them, to give any security or guaranty for the goods I purchased of

them, and no guaranty or security was ever given them for any purchase I made of them, to my knowledge. They never refused to fill my orders or give me credit without a guaranty or security. The balance due from me to the defendants at the time of my failure was $241.04. In reference to the sum of $189.42, which the plaintiff paid for the witness, the witness said: In February, 1857, I think that small amount was due, and I wrote to my brother to pay it for me. Shortly after, I refunded him the money. The greater portion of the goods were purchased upon orders sent by me from Quincy to Chicago to my brother, and telling him to fill them; two parcels I bought myself, one from John Ross, and one from Mr. Holliday. I was not asked upon either of those occasions to give security. They were quite willing to sell goods, anxious to sell more than I would buy. I never heard before the commencement of this suit of my brother Adam becoming my guarantor or security.

Upon cross-examination, this witness stated that the value of his assigned estate was about $5,000, and his indebtedness about $8,000 or $9,000. That he was indebted to his brother Adam at that time, some $500 or $600. He stated that his brother had no interest in his store.

The defendants, upon their part, read the deposition of *John Ross,* who testified substantially as follows: I reside in Canada; in 1859 I was in the employment of the firm of William M. Ross & Co. as a general overseeing clerk; In that year, the plaintiff, Innis, was in their employment as cashier; I was present at a conversation between the plaintiff and one of the defendants in December of the same year; it was on the night of the 12th of December, which was Monday; John H. Ross came to me and said he wanted me to hear what he had to say to the plaintiff, Innis; I went with him to the desk where Mr. Innis was, and while there John H. Ross forbid Innis from taking any money without authority, and he also told him if he took any money without his consent, he would subject himself to a criminal action; Mr. Innis left the store and never came afterwards as the employé of the defendants; the conver-

sation between them was about a balance of salary claimed by Mr. Innis, which was $166, and about a quantity of goods that Alexander Innis had bought; John H. Ross told Mr. Innis that if they owed him anything to present his bill, and when William came home they would pay, as he understood they had an arrangement about Alexander's account; I had a conversation with the plaintiff in the latter part of November, 1859, while William M. Ross was in New York; we were both talking about leaving Ross & Co., and Mr. Innis told me that he would not stay one hour longer in their employ only for that debt of Alexander's, and his conversation led me plainly to understand that he was security and had guaranteed the payment of, and agreed to work it out; that he did not like the way in which William M. Ross treated him.

The testimony of *Robert Blackwell, Esq.*, given on a former trial, was introduced by the defendants, which was as follows: Early in the month of December, 1859, before the affidavit was made for the arrest of Mr. Innis, I was called upon by John H. Ross for my advice as an attorney-at-law relative to the subject matter of that affidavit, and on the first interview I believe he told the whole facts of the case. As I was in the habit of doing with clients, I questioned him as to the state of facts that he was personally cognizant of at that time. In the course of the consultation he said that Mr. Adam Murray was a relative of Innis and of themselves. I declined giving them any advice until I had examined the matter more closely, and that in the meantime he had better go and consult with Mr. Murray about this matter. Also, it was said to me that he had telegraphed to his brother in New York since the transaction, and that his brother had directed him to consult with a Mr. Hervey. It seems they did not find him, and came to consult with me. I told him that if after consulting with Mr. Murray they would bring me the facts in the case I would give them a definite opinion. Things passed off in this way until Mr. William M. Ross returned from New York, when he came to my office and recapitulated the conversation with John H. Ross. He desired my opinion as to whether he

should proceed against Innis civilly or criminally. I told him I could not give an opinion until I had examined the books and the account of Mr. Innis, and learned the rules of business by which the clerks in their establishment were governed. The question to be determined was, as to the criminal intent in taking the money. He said that was appropriate, and that he would meet me at the store on that day; that was the morning of the 26th of December. I called at the store but did not find Mr. William Ross there. I was shown the books by Mr. Kennedy. After the examination of the books, which consisted of a sales book, I think one or two ledgers and cash books, and looking all through, I made me a memorandum in writing which I have mislaid, and afterwards commenced an examination of several of the clerks as to the rules in reference to the payment of moneys, and also in reference to the entries in the books. Having examined them, when Mr. Ross came in I told him I had examined the books and the clerks. He asked me my opinion whether he should proceed in the case civilly or criminally. I told him I wished to go home and make some further examination before expressing my opinion. He called in the afternoon after I had concluded my investigation, and I told him that a criminal prosecution would lay in the case, which advice I gave in good faith. Mr. William Ross asked me if this charge could come in. I told him, no sir, that he was responsible, and could not cover it up by any entries he might make. I then wrote the affidavit and it was sworn to by Mr. Ross. I was present at the examination, and examined witnesses. The result was the discharge of Innis, on the ground, as the justice stated, that the evidence did not show a criminal intent. I was informed that there was a rule of the establishment that they paid their clerks at stated periods, that when any one took out more cash than $5, there was to be a check drawn upon their bankers, which should be signed either by William M. Ross or indorsed by John H. Ross. Violations of this rule were spoken of. Sometimes they were allowed to be paid sums in cash over $5, without checks, but that was by consent of the parties. I saw

these entries on the books, that was one source of my information. It was a matter of conversation with John H. Ross that Mr. Innis claimed the money as a salary. At the first interview with William Ross after the consultation of Mr. Murray, he said that Mr. Innis said his defense would be that he had never promised to pay the debt of his brother who lived at Quincy. Mr. Ross persisted to me that he had thus promised both of the Rosses, in fact, and that was one of the objects I had in looking at the books. I took my clients' statement as true. In the first place, William Ross said to me that they were related, and he was very loth to prosecute unless he was considered as a criminal. That he had a brother in Quincy, and that when in business, or about to go into business, he had applied to him for credit. That he did not desire to trust unless he had some security for money. That Mr. Adam Innis was their cashier, and had the evidence of these facts brought to his knowledge, and that it was agreed between them and Adam Innis that he would guarantee the debt of his brother; it was all right and they would furnish him goods. This was the statement of the agreement, when Mr. Ross said to me, the fact that in pursuance of that agreement, an entry had been made to Adam Innis' account, with his knowledge and consent, which was a ratification of that agreement. Then the question put to me this second time was, whether I would advise to a criminal prosecution. I told him the only objection was, the state of the parties. The question was as to the criminal intent which must be underlying and based on the consideration of making the parties responsible, and the question to decide was, whether it was original or collateral. I decided it was original. He had violated a verbal promise; it was evidence of criminal intent.

Mr. William Ross testified before the magistrate substantially to the same facts he stated to me. I saw the entry of $166. The only additional fact stated by Mr. Ross in regard to the arrangement about Alexander Innis' account, was that Alexander had made an assignment to somebody else, and I relied upon that as an additional point in the case; I exam-

ined him myself in regular chronological order, commencing from the time Mr. Innis began in their employment to his departure from it, and particularly upon the points in reference to and bearing upon the abstraction of this money, and that was testified to. I then put a further question as to the rules of the establishment, and he told me in reply what the rules were as before. I asked him as to when he first received information as to this alleged embezzlement, and he said he was in New York, and he received it from his brother. William M. Ross acted upon my advice in getting out the warrant. When I had given my opinion, I wrote the affidavit. The warrant was delivered by me to Mr. Ross, who put it in the hands of an officer, and the arrest was made.

During the examination before the magistrate, I was examining Mr. Adam Murray on the subject of the particular words used by Mr. Ross in speaking of ruining Mr. Innis. Mr. Murray was a witness on the part of the defense. In the course of his testimony, he said in reply to a question put by me as to the words used by Mr. William M. Ross, that he said: "If the case was not settled, it would ruin him (Innis)." Mr. Ross sat by me at the time, and said that was his interpretation. I put the question over again, "whether he was not certain that Mr. Ross said he would ruin him," or, "whether he said that the effect of criminal prosecution would be to ruin him." His reply was that he did not remember the form of his expression. I pressed him, and he could not answer positively which way it was.

On cross-examination, *Mr. Blackwell* testified: The first day I went to the defendants' store, and the first day I saw William Ross after his return from New York, was the day the affidavit was made. I had an interview with William Ross before the affidavit was drawn. I made no examination of the books at the store until the day the affidavit was drawn. I stated that William Ross told me that Adam Innis had guaranteed the payment of the debt of Alexander. I saw the entry on the sales book of the $166. I did not see it on the ledger. I examined the account of Adam Innis in the ledger only as far as the item where he was charged to Alex-

ander Innis, $241.04. I did not go any further. If I have said that Mr. William Ross told me that charge was made by Innis' consent, I did not mean to say so. I stated what Mr. Ross said was the agreement. I told Mr. Ross there must be an intent of stealing money; that the question was, whether there was an intent to steal. I advised him there must be a criminal intent.

The defendants then introduced the following dispatch from William M. Ross to John H. Ross:

"NEW YORK, December 13, 1859.
"To W. M. Ross & Co.

"If Hervey advises, arrest Innis for embezzlement. I have telegraphed Carver to pay on your signature.

"WM. M. ROSS."

The defendants then read in evidence section 70 of chapter 30, Revised Statutes.

This was all the evidence in the case. Several instructions were given, and some refused, which it is not necessary to notice here.

The jury returned a verdict for the plaintiff, and assessed his damages at $10,000. A new trial was refused, and judgment entered upon the verdict. The defendants thereupon took this appeal, and now insist that the damages were excessive; and that there was probable cause for the prosecution of the plaintiff.

Messrs. WALKER & DEXTER and Mr. JOHN J. McKINNON, for the appellants.

Messrs. HERVEY, ANTHONY & GALT and Mr. B. S. MORRIS, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action on the case for malicious prosecution brought in the Superior Court of the city of Chicago by A. G. Innis against William M. and John H. Ross, composing

the mercantile firm of Wm. M. Ross & Co., doing business in · that city. The case has been three times tried by juries, and three verdicts obtained by the plaintiff with heavy damages. The first verdict was set aside by the court in which it was rendered, the judgment on the second was reversed by this court and the cause remanded. The result of the remand was another trial and a verdict for plaintiff for ten thousand dollars and judgment thereon. This judgment is brought here by appeal on bill of exceptions, and a reversal prayed on various grounds.

The charge on which the plaintiff was arrested was embezzlement—that, while a clerk in employment of the defendants, it was his duty to receive, safely keep and disburse the moneys of the firm. That during the continuance of his employment, he was intrusted with the sum of one hundred and sixty-six dollars by the firm, which, without the knowledge or consent of the firm, and against their will, he feloniously converted and appropriated to his own use, and embezzled from the firm with the intent to steal the same. He was examined on the charge and acquitted.

The question for determination in the several trials had, was, as to the criminal intent of the plaintiff in taking the money. That he took the money and appropriated it to his own use, the plaintiff never, at any time denied, he claiming the right to take it, as the balance of his salary as cashier, due him from the firm.

The defendants insist, and have always insisted, that there was probable cause for the arrest, and further, before they proceeded to take any steps towards plaintiff's arrest, they obtained the advice of eminent counsel, and acted upon that.

If either of these grounds exists, and was proved, the verdict was wrong, and should have been set aside. If they do not exist, then another question will have to be considered, and that is, the amount of the damages.

These grounds of defense will be examined. Probable cause is defined by this court to be a reasonable ground of suspicion supported by circumstances, sufficiently strong in themselves,

to warrant a cautious man in the belief that the person accused is guilty of the offense charged. *Richey* v. *McBean*, 17 Ill. 65; *Jacks* v. *Stimpson*, 13 id. 701; *Hurd* v. *Shaw*, 20 id. 356. If probable cause for the arrest exists, malice on the part of the prosecutor cannot be considered — it weighs nothing. The *onus* is upon the party bringing the action to show that the criminal prosecution was the offspring of malice and without any probable cause to justify it — that the prosecutor had no sufficient reason to believe the accused guilty. The want of this element, probable cause, is the main ground of this action, and it must be clearly shown; and though malice may be inferred from the want of probable cause, a want of probable cause cannot be inferred from malice. The burden is on the plaintiff to show affirmatively, by circumstances or otherwise, that the defendant had no ground for the prosecution — no such reasonable ground of suspicion sufficiently strong in itself to warrant a cautious man in believing that the person arrested is guilty of the offense charged. In addition to the cases above cited, reference is made to the case of *Israel* v. *Brooks*, 23 id. 576, on this point.

In the last cited case, the court said, what those circumstances may be, cannot be specified, but we would think, among them, the good character of the party accused would stand out prominently. That is a strong fact, if known to the accuser, to ward off suspicion, to weaken a belief, he being a prudent and cautious man, in the guilt of the suspected party.

A glance at the leading facts must satisfy any one that no probable cause existed for the arrest.

The plaintiff had been in the employment of the defendants more than four years, and had an established character for honesty. During that time the daily receipts of the concern averaged fifteen hundred dollars, not one dime of which was unaccounted for by the plaintiff. A charge was made against him of a debt due from his brother, which the defendants claimed was to be paid by the plaintiff, and which they sought to set up against his salary. Denying the agreement, or any understanding that his brother's debt was to be charged against

his salary, but insisting it was to come out of certain insurance money, he, on leaving the establishment, appropriated to the payment of salary due the sum of one hundred and sixty-six dollars out of moneys of the firm in his hands. This was known to the defendants, and known, too, that he claimed the right to do so. He was not bound by the rule of the house, that sums over five dollars should be paid out on checks only drawn either by Wm. M. Ross, or by the plaintiff indorsed by other partners, as he was not a clerk in the meaning of that rule. Nor was that rule always observed, for repeated instances are shown in which it was departed from even as to the clerks. The defendants knew perfectly well, when they caused the plaintiff to be arrested for embezzlement, that he took the money as his legal right, for the balance of his salary, and that he denied the right of defendants to pay his brother's debt out of his salary ; that he retained the money as salary and made the proper entry in the book against himself, and pointed it out to John H. Ross at the time, insisting all the while on his right to take the payment of his salary. An embezzling thief would not so act. There is not one circumstance shown in the case, on this point, tending to make out probable cause, but everything to dissipate such a notion.

On the other point, that the defendants acted under the advice of counsel, that defense can never avail unless there has been a full statement of all the facts to the advising counsel, all the facts of which the party is in possession, or which by reasonable diligence he could have ascertained. *Ash et al.* v. *Marlow*, 20 Ohio, 119. In *Stevens* v. *Fassett*, 27 Maine, 266, it was held if a person with an honest wish to ascertain whether certain facts will authorize a criminal prosecution, lays all the facts before one learned in the law, and asks his deliberate opinion thereon, and the advice obtained is favorable to the prosecution, it will go far in the absence of other facts to show probable cause, and to negative malice in the action for malicious prosecution ; but if it appears that the party withheld material facts within his knowledge, or which in the exercise of common prudence, he might have known, the opinion which

he invokes in his defense cannot avail him. To the same effect are the cases of *Bliss* v. *Wyman et al.*, 7 Cal. 257, and *Kendrick* v. *Oyssert*, 10 Humph., 291. Many other cases might be cited on the point, but it is unnecessary, as the bare statement of the principle proves its correctness. That the defendants withheld from their counsel several important facts is fully proved.

In the first place they sought to impress upon Mr. Blackwell that the plaintiff was an ordinary clerk, and subject to certain rules of the establishment, governing the clerks in obtaining money; that the plaintiff had violated those rules in such a way as to make him chargeable with the crime of embezzlement. The fact was, and must have been known to the defendants, that the plaintiff was not in that category at all, that his name never was on the pay roll of the clerks, and was not, and had not been subject to the rules as to his 'pay which governed the clerks as to their pay. By this their counsel was misled. The plaintiff's true position was very important to be known by Mr. Blackwell, and if stated to him as it really was, it is not probable this sagacious lawyer would have seen any indication of embezzlement in the act done. Mr. Blackwell's idea undoubtedly was that plaintiff was but a clerk and subject to the rules as to payment governing them.

Again, the defendants did not tell their counsel, if plaintiff was subject to this rule, that it was violated daily. If counsel had been informed of that fact, he would scarcely have said plaintiff was guilty of embezzlement for violating it for the purpose avowed.

Again, the defendants did not inform their counsel that the plaintiff was the assignee of his brother, against whom they held a balance, and that plaintiff claimed he was to pay this balance out of the assigned effects, and not out of his salary. This fact was never communicated to him, nor did the counsel ever hear of it until after the examination before the magistrate; then for the first time he heard of the assignment.

The defendants also stated to their counsel that it was agreed between them and the plaintiff, that if he would guarantee the debt of his brother, it was all right and they would furnish

him goods, and that in pursuance of that agreement, an entry had been made to plaintiff's account, with his knowledge and consent, which was a ratification of the agreement.

Alexander Innis testifies he never heard of such a thing as a guaranty for his purchases; that he was never required to give any security, nor was any guaranty given by anybody to his knowledge, and never heard that plaintiff had become his guaranty. He says that the entry of a credit as paid by plaintiff on his account, of $189$\frac{42}{100}$, on 23d January, 1858, was made by plaintiff at his special request, as an act of friendship, and was confined to that single transaction.

Mr. Murray, the common uncle of the parties, had a conversation with the plaintiff about this matter, at the request of John H. Ross, when plaintiff told him to remind John Ross that when he took the money, he had told him of it, and charged himself with the amount on the books. This was communicated to John H. by Mr. Murray, but it was not communicated to counsel.

These were important facts and should have been revealed to counsel. The whole truth, all the facts, should have been fully disclosed. As they were not, the defendants are not permitted to seek refuge under the advice given on a garbled statement of the facts.

If justice was the sole object, if the laudable desire of bringing a culprit to punishment moved the defendants, if no wicked spirit stirred them, they would have disclosed the minutest fact to their counsel. Had they told him what has been proved on this trial, as shown in this record, it is not possible to believe Mr. Blackwell would have advised a criminal prosecution. This ground of defense entirely fails.

But there are some facts going to show that the defendants did not act on the advice of counsel, but had made up their minds to prosecute the plaintiff criminally before counsel had been consulted.

Mr. Murray testifies that soon after the plaintiff left the service of the defendants, John H. Ross, one of the defendants, sent for him on particular business. He went to the store and

met John, who told him that plaintiff had taken one hundred and sixty-six dollars from the desk, that it was the same as stealing it; and he was resolved on prosecuting him criminally for it. He also said he had a telegram from his brother, from New York, requesting him to arrest plaintiff if he did not pay back the money. He said he would bring him back if he should go to Texas. Witness was advised to see him and to tell him he would have him arrested if he did not pay the money back. On this being communicated to plaintiff he told witness to tell John Ross he would not pay back the money, that he took it as the balance of salary due and coming to him, no more, and to remind John Ross that when he did take the money he had told him of it, and charged himself with it on their books, and as to attempting to arrest him, they could not do it without swearing falsely, and if they did, he would take them up for it. This was stated to John Ross and he replied, he would arrest him in a short time, and we will see how he will like to be sent to Joliet. The witness warned Ross that he had better be cautious, that by arresting him, he might place plaintiff in a better position than he was in before. Ross replied to this, "nonsense, how could he fight such a house as this." Afterwards, on the return of William Ross from New York, the same witness states that he said to witness, plaintiff had had the presumption to take one hundred and sixty-six dollars from the desk, against the well known regulations of the store, and that he was resolved to make an example of him, he would let him see if he could play such tricks with him with impunity, and if he did not pay it back he would ruin him, he would make him, that he would never get a situation in Chicago as long as he lived. That they would arrest him and take him before a police magistrate, &c. On being asked what he wanted plaintiff to do, he replied, he wanted him to pay back that money. Witness then stated, if desired, he would see plaintiff once more and tell him his determination. Saw plaintiff accordingly, when he said, no threats should compel him to pay back what was justly his own, no matter from what quarter they came; that he only took what was due to him and no

more; that the money taken was the balance of salary coming to him, and to remind Ross that he never promised to pay the balance of his brother's account; that whatever passed on that subject depended upon the proceeds of his brother's assignment and did not amount to a promise. This was communicated to William Ross, but he did not communicate it to his counsel.

These facts show a previous determination by defendants to arrest plaintiff on a criminal prosecution, before they had consulted counsel, and that consultation was a mere cover to carry out their own wicked intentions.

These facts go far to show that the defendants did not intend to be governed by the advice of counsel, whatever it might be. They had formed a previous determination to prosecute him at all hazards for a crime which they had every right to know the plaintiff had not committed.

The evidence fully establishes malice on the part of the defendants. In addition to what we have cited above, as evidence of malice, one of the defendants, on the investigation before the magistrate, and after the plaintiff had been discharged, said: "If anybody comes to me to inquire after plaintiff's character, I will say that he stole $166 from me, and that he is a thief and a liar."

Now as to question of damages. Here have been three verdicts finding heavy damages in each. Apart from the principle that courts seldom disturb verdicts on the ground of excessive damages, after three trials, having the same result, it must be a very strong case indeed in which this court, in an action sounding wholly in damages, will interpose to set the verdict aside. *Wolbrecht* v. *Baumgarten*, 26 Ill. 294.

This court has held that a verdict should not be disturbed on account of excessive damages in cases of tort, unless it be probable from the amount of damages assessed, that the jury has acted under the influence of prejudice or passion. *Schlencker et al.* v. *Risley*, 3 Scam. 484.

To judge from the amount of damages assessed, whether the jury have acted from prejudice or passion, the circumstances of the case must be well considered. Here, in this case, was a

causeless attempt, by a wealthy house, to blast forever the character of a young man just entering upon the active pursuits of life, with no endowment but his talents, fair character and uniform integrity. To him these were a priceless possession, in comparison with which, the amount awarded by the jury is trifling indeed. We cannot perceive, in the amount assessed, sufficient indications that in finding it the jury were actuated by prejudice or passion, or any unworthy motive. It was a powerful house making a heavy charge against a poor and friendless young man, placed in peculiar circumstances, which, if true, would have consigned him forever to a doom more dreadful than the grave, and forced him to become a wandering outcast on the face of the earth. There is no standard by which damages in such a case shall be measured. Much is committed to the intelligence of the jury, much faith is reposed and must be, in their sense of right and justice. We cannot say they have gone astray, and cannot, therefore, disturb this verdict.

A powerful house, possessed of extensive means, which one of the defendants thought it would be the greatest temerity for the plaintiff " to fight," in vindication of his honor and integrity, by their own wrong act and most unjustifiable conduct, and by the decision of a jury of their own selection, has placed the person in a position where he can further illustrate his good qualities and do business on a respectable capital contributed by the very men who sought his ruin through an infamous charge which they knew was unfounded. Such is retributive justice! The judgment is affirmed.

*Judgment affirmed.*