### John F. Waters v. West Chicago St. R. R. Co.

1. CORPORATIONS—*Their Means of Acquiring Knowledge.*—A corporation can be informed as to, and direct matters only through the agency of its officers and agents, and whatever information comes to its officers or agents, comes to the corporation.

2. SAME—*Liability for Malicious Prosecutions.*—Anciently, at common law, trespass did not lie against a corporation, and it was held that an action of malicious prosecution could not be maintained against a corporate body; but such is not the law at the present day.

3. SAME—*The Modern State of the Law.*—The rule now is that if a servant of a corporation in pursuance of his business and to accomplish that which he was authorized to do, commits a trespass, the corporation is liable, although the servant may have been actuated by malice; but when the servant, while about his master's business, to accomplish an end of his own commits a trespass, the master is not liable.

4. EVIDENCE—*Declarations of an Agent, When Admissible.*—The declarations of an agent as to the matter in his charge, accompanying his acts in relation thereto, are admissible with reference to the then existing state of affairs; but what he may have said at a time when the particular acts complained of were not under consideration, is not admissible.

5. SAME—*Of Malice in Actions for Malicious Prosecution.*—Where the defendant in an action for malicious prosecution caused or secured the publication of an account of the arrest of the plaintiff or of the charges against him, such fact is admissible as tending to show malice.

6. MALICIOUS PROSECUTION—*Evidence of the Plaintiff's Reputation as to Matters Bearing on the Question as to Whether he Would be Likely to Commit the Crime of Which he Was Accused.*—On the trial of an action for malicious prosecution the reputation of the plaintiff as to matters bearing upon the question as to whether he would be likely to commit the crime of which he was accused, may be given in evidence, so far as such reputation was known to the defendant when he instituted the prosecution.

7. SAME—*Reports and Newspaper Publications, When Admissible.*—Reports and newspaper publications, if communicated to the defendant

before beginning the prosecution, are admissible so far as they bear upon the question of whether it was probable that the plaintiff was guilty of the crime with which the defendant charged him, as bearing upon the effect of the prosecution upon the plaintiff's business.

8. PRACTICE—*Evidence of Good Character Not to be Rebutted by Evidence of Particular Acts.*—Evidence of good character or general reputation can not be rebutted by evidence of particular acts, but upon cross-examination the conduct of the plaintiff may be reasonably inquired into with a view to the question of his veracity.

9. SAME—*Cross-examination as to Collateral Matters.*—A party who brings from a witness answers as to collateral matters will not be allowed to contradict testimony thus elicited.

10. SAME—*What Questions a Witness May be Compelled to Answer.*—A witness may be compelled to answer questions material to the issue, although his reply may impute disgrace to him.

**Malicious Prosecution.**—Error to the Circuit Court of Cook County; the Hon. HENRY B. WILLIS, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1901. Reversed and remanded. Opinion filed March 18, 1902.

This was an action to recover damages for an alleged malicious prosecution.

The plaintiff had been arrested, held to bail, indicted and tried at the instance and by the procurement of the defendant.

Upon the trial it appeared that one George Clinton, having been injured by a car operated by the defendant, brought suit in the Superior Court against the railroad company in February, 1892; that this cause was tried May 1 and 2, 1895, and resulted in a verdict for the defendant, John F. Waters being the plaintiff's lawyer therein; that upon the trial of that cause George Clinton, his son Frank, his daughter Rose, John and Clara Cling, testified that George, on account of the injuries so by him received, was laid up for six months; some of the above named placing the time as high as nine months. It appeared that in truth George Clinton was laid up only from four to five weeks; and at the expiration of this time went to work for the Northwestern Railway Company.

On the afternoon of May 2d Edmund Furthmann, one of the attorneys for the defendant in that case and who " most cordially " hated the plaintiff herein, went before a justice

of the peace and swore out warrants for the arrest of the above named Clintons and Clings, on the charge of perjury. These warrants Furthmann took to the Mooney & Boland Detective Agency and gave them to Mr. Sutherland, its manager, directing him to detail operatives to arrest the Clintons and Clings and examine them as to testimony they had given in the civil suit against the street railway company.

Sutherland directed one John F. Quaid to take the warrants, arrest and bring in the parties. They were brought in by Quaid, and examined by Furthmann and Sutherland in the detective office—their statements being taken down by a stenographer. The next morning Furthmann, who was the general trial lawyer for the defendant and who had tried for the company the said case of George Clinton against it, went to Jamieson, the general counsel and vice-president of the defendant, and told him what had taken place at the detective agency. Jamieson told him to have nothing more to do with the matter as he didn't want his feeling against Waters to be an element in the affair. Jamieson employed William S. Forrest, a reputable and capable lawyer, to investigate the matter and report. Forrest saw and talked with the arrested Clintons and Clings, and after examining them, reported to Jamieson that he thought there was a clear case against Waters for conspiracy and subornation of perjury. Forrest, Furthmann, Sutherland, Devereux and Bacharach, in the trial of the present case, stated that the arrested parties in these examinations said they had testified that George Clinton was laid up six months, because Waters, his lawyer, had told them to do so.

The report of Forrest having been received, the defendant company had warrants against Waters sworn out, and he was arrested, held to bail, tried and discharged, as before stated.

Thereupon the present suit was brought. The defendant interposed the defense of probable cause and that it acted upon the advice of reputable counsel.

The declaration, among other things, charged that the

defendant caused George Clinton to testify before the grand jury, etc., well knowing that the evidence thus given was false; and also that the defendant, well knowing that the testimony of certain named witnesses would be willfully false, caused them to go before the grand jury and testify that the plaintiff had conspired with George Clinton to obtain from the defendant $10,000 by false and perjured testimony in a certain suit, etc.

S. P. DOUTHART, E. F. ABBOTT and JOHN F. WATERS, attorneys for plaintiff in error.

JOHN A. ROSE, JAMES W. DUNCAN and C. LeROY BROWN, attorneys for defendant in error; W. W. GURLEY, of counsel.

MR. JUSTICE WATERMAN delivered the opinion of the court.

The arrest, prosecution and acquittal being admitted, the plaintiff was bound to prove want of probable cause therefor and might introduce evidence tending to show malice, although malice could be inferred from want of probable cause.

To show these, the plaintiff called to the witness stand John F. Quaid who, at the instance of the detective agency employed by the defendant, arrested George Clinton, Frank Clinton, Rose Clinton, Clara Cling and John Cling, and took them to the rooms of Mooney & Boland. Quaid testified:

"I came down with George Clinton and Rose to the agency, and reported to Sutherland. I told him that Clinton had refused to implicate Waters.

(Objection by defendant; motion to strike out; ordered stricken out; exception by plaintiff.)

Q. Just state what you told Sutherland or Furthmann that Clinton said.

(Objection by defendant.)

Mr. Waters: I offer to prove by this witness that when he went out and arrested the Clintons and Clings, that George Clinton told the witness that Waters was innocent of any wrong-doing; that he had not told him, George Clinton, nor any of his witnesses, to swear falsely, and that the witness reported those facts to Sutherland, the superintendent of the agency, and also to Furthmann, the general

attorney of the company, and that this information was conveyed to both Sutherland and Furthmann before any warrant was sworn out for the arrest of Waters.

(Objection by defendant; objection sustained; exception by plaintiff.)

Q.   Now, just state what you told Mr. Sutherland and Mr. Furthmann, that Clinton said.

(Objection by defendant; objection sustained; exception by plaintiff.)

Q.   Did you have any conversation with Sutherland in regard to what Mrs. Clinton said about the guilt or innocence of Mr. Waters?

(Objection by defendant; objection sustained; exception by plaintiff.)"

Mary Clinton, called on behalf of plaintiff, testified as follows:

" My name is Mary Clinton.   I am the mother of Frank Clinton; I did go to the office of the West Chicago Street Railroad Company with George Clinton.   Well, it was before the Clinton case was tried.   I remember that.   I don't know how many months before it was, but it was more than six months.   I saw a man—I didn't know his name—in the office.

Q.   Well, what occurred there?

(Objection by defendant.)

(Jury withdrawn.)

(Objection sustained.)

Mr. Waters :   We offer to show by this witness that at least six months before the day on which it is claimed that Waters instructed George Clinton to say that he was laid up nine months, instead of nine weeks, that this witness and George Clinton both went to the office of the claim department of the defendant company, and that George Clinton then and there told Mr. Fisk, the claim agent of the company, that he, George Clinton, was laid up nine months on account of the injuries sued for in the case of Clinton v. West Chicago Street Railroad Company, and that he signed and swore to an affidavit in which he claimed he was laid up nine months on account of said injuries, and filed said affidavit with the claim agent."

Addie Rogers, a witness on behalf of plaintiff, testified as follows:

" My name is Miss Addie Rogers.   I was formerly Mrs. Hosher; I know Edmund Furthmann, and knew him in

April, 1895. I had known him between '93 and '95. I could not tell you when.

Q. Did you ever meet him in Mooney & Boland's office?
A. Yes, sir.

(Defendant moves to strike answer out; ordered stricken out by the court; exception by plaintiff.)

Q. Did you ever hear any conversation with any of the attaches of the Mooney & Boland Agency with reference to Mr. Waters? A. Yes, sir. In the Mooney & Boland Detective Agency, in the spring of '95. I don't remember the date. The conversation was principally with Mr. Sutherland. Several others talked with me, but Mr. Sutherland was the principal one. I positively don't know the day of the month. I only know it was in the spring of 1895, when my husband and I were both arrested, and I know that during the two days and nights and until ten o'clock the next day—I did have a conversation with Edmund Furthmann in the Mooney & Boland Detective Agency, at the same time I had the conversation with Sutherland.

Q. How long were you in that agency there?

(Objection by defendant; sustained; exception by plaintiff.)"

In determining whether a prosecutor had probable cause for what he did, all the information he had when he began the prosecution is to be considered; not merely that of which he was possessed tending to show cause for the prosecution.

A corporation can hear of, be informed as to, and direct matters only through human beings. Furthmann was the defendant's general trial lawyer; he had tried for it the case, witnesses in which were charged by the defendant to have committed perjury at the instance of Waters. Furthmann had, for the defendant, employed the Mooney & Boland Detective Agency to investigate the matter; whatever information thereafter came to the superintendent of such agency or to Furthmann came to the defendant.

The defendant urges that Quaid was an agent merely to arrest and bring in, and not to hear statements by the accused witnesses, and that what Quaid was told is no more a communication to the defendant than would have been a conversation with the office boy.

The plaintiff offered to show not merely what an office boy or Quaid had been told, but what the chief officer of

the detective agency and the counsel in this matter of the defendant had been told. The plaintiff also offered to show that the Clintons and Clings, when and after they were arrested, were told by officers of the detective agency that they could get off by throwing the blame on Waters; that Furthmann assured the agency that Waters was the one the defendant was endeavoring to reach; that bonds for the arrested Clintons and Clings were secured by the defendant, and that it was under such circumstances and indictments that the statements accusing Waters of advising them to commit perjury were made.

All that defendant, before preferring charges against Waters, knew as to the circumstances under which the Clintons and Clings accused the plaintiff, was admissible. It was upon such statements that the defendant justified its action. While there was no impropriety in endeavoring to reach and convict Waters rather than the perjured witnesses, if the defendant believed Waters to be guilty, yet the fact that it did so, if such there be, as well as what the defendant knew about the means employed to induce the witnesses to accuse Waters, should have been admitted.

Not only was such testimony admissible as bearing upon the question of probable cause, but upon the defense of advice of counsel.

If the defendant failed to inform Forrest of the circumstances under which the Clintons and Clings went before him; the statements, if any they had made, exculpating Waters; the inducements, if any, held out to bring about an accusation of Waters; the fact, if such there be, that Mary Clinton and George Clinton, six months before the time Waters is said to have urged them to place the time of the illness of George at nine months, went to the defendant's office and there made affidavit that the time George was laid up was nine months; then the defendant did not communicate to Forrest all the information as to this matter it then had, and can not avail itself of his advice. Ross v. Inness, 35 Ill. 487; Roy v. Goings, 112 Ill. 656–665; Anderson v. Friend, 71 Ill. 475; Neufeld v. Rodeminski, 144 Ill. 83–98.

The charge in the indictment against Waters was that he and others criminally conspired to cheat the defendant by falsely introducing in the trial in the Superior Court testimony that George Clinton was confined to the house for at least five or six months by reason of certain injuries; the said testimony being then and there false and corrupt; the said Waters well knowing that said Clinton was not confined to the house five or six months by reason of said injuries.

Whatever, therefore, tended to show that the defendant, before beginning the prosecution, had been informed that George Clinton was so confined and that he had truly testified, was admissible.

Anciently, at common law, trespass did not lie against a corporation; and long time ago it was held that an action for false imprisonment could not be maintained against an incorporated body.   Orr v. Bank of U. S., 1 Ohio, 36; Dumper & Syms, 1 Roll. 515; 1 Blackstone Com. 503; Vanderbilt v. Richmond Turnpike Co., 2 N. Y. 479; Sec. Vin. Abr., Corps., K. 22.

This is no longer the law.   So, by the old law, a master was not liable for a willful or malicious act of his servant. 2 Rolle's Abr. 553; Noys' Maxims, Chapter 44; Middletown v. Fowler, 1 Salk. 282; M. Manus v. Crickett, 1 East, 106; see St. Louis Ry. Co. v. Dalby, 19 Ill. 153.

The rule now is that if a servant, in pursuance of his master's business and to accomplish that which he was authorized to do, commit a trespass, the master is liable, although the servant may have been actuated by malice; but if the servant, while about his master's business, to accomplish an end of his own, assault another or commit a trespass, the master is not liable.   Seymour v. Greenwood, 6 Hurlst. & Norman, 359; Croft v. Alison, 4 Barnwell & Alderson, 590–592; Mott v. Consumers' Ice Co., 73 N. Y. 543; Goodspeed v. East Haddam Bank, 22 Conn. 530.

The declaration of an agent as to the matter in his charge, accompanying his acts in relation thereto, are admissible with reference to the then existing state of affairs.   Thompson on Corporations, Secs. 4913–4914.

Whatever any agent of the defendant, authorized by it to take steps for or to institute the prosecution of Waters, said while in the pursuance of such business in relation thereto, is admissible in so far as it was descriptive of a then existing condition of feeling, intention or otherwise. Newell on Malicious Prosecution, 456–457.

What an agent may have said at a time when the particular prosecution complained of was not under consideration is not admissible.

It is true that that intangible entity which a corporation is, can not feel safe as its agents feel, but it does not necessarily follow that in the operations of this artificial creation it is actuated by the malice which the agents that carry out its purpose have. Thompson on Corporations, Secs. 6299–6300.

If the defendant caused or secured publication of the arrest of Waters or of the charges against him, such fact may be shown as indicative of malice. Allison v. Chandler, 11 Mich. 542.

The court properly sustained the defendant's objection to the questions put to Furthmann as to his having been guilty of certain improper acts having no connection with the case on trial. The same is to be said as to certain questions asked of the witness Kemp.

For a lawyer to ask a witness if he was not accused of a crime, as to which neither crime nor accusation could have had any connection with the case on trial, is an offense which may properly be dealt with by the trial judge in a manner that will prevent its repetition. The propounding of insulting questions to witnesses for the purpose of intimidating or humiliating them should not be tolerated.

In a trial for malicious prosecution, the reputation of the plaintiff as to matters bearing on the question of whether he would be likely to commit the crime of which he was accused may be given in evidence so far as such reputation was known to the defendant when he instituted the prosecution. Israel v. Brooks, 23 Ill. 575.

The report and newspaper publication from Kansas City,

if communicated to the defendant before beginning the prosecution, were admissible in so far as they bore upon the question of whether it was probable that Waters was guilty of the crime with which the defendant charged him. Much of each of these had no bearing upon this. As bearing upon the matter of damages, the effect, if any, of the prosecution upon the plaintiff's business was admissible. Newell on Malicious Prosecution, 494.

The defendant having introduced the before mentioned publication in and report from Kansas City the plaintiff offered to show that his reputation in Kansas City was, when he resided there, good. Attacked by the defendant as this reputation had been, we see no reason why the plaintiff should not have been permitted to not only deny the conduct with which he was thus charged, but that his reputation when he lived there was and had remained good. As to this, Holmes v. Stateler, 17 Ill. 453, Blackburn v. Mann, 85 Ill. 222–227, and Brown v. Luehrs, 1 Ill. App. 74–78, are pertinent.

Evidence of good character or general reputation therefor can not be rebutted by evidence of particular acts, but upon cross-examination the conduct of the plaintiff may be reasonably inquired into with a view to the question of his veracity.

This reasonableness of examination applies not only as to the conduct which may be inquired into but also as to the time thereof. The cross-examination should not extend to things properly buried in the oblivion of the distant past, nor to matters which throw no light upon the truthfulness of the witness. Wharton on Evidence, Sec. 541; Toledo, W. & W. Ry. Co. v. Williams, 77 Ill. 354–359.

Nor will a party who brings out from a witness answers as to collateral matters be allowed to contradict testimony he thus solicits.

Questions material to the issue a witness may be compelled to answer, although his reply may impute disgrace to him. Wharton on Evidence, Secs. 542–549.

Whether a person has at some time lapsed from virtue, or

been in a fight, or is a good lawyer, does not tend to show whether he would probably be guilty of suborning witnesses to commit perjury or whether he is telling the truth on the witness stand.

It is not the case that the defendant in a malicious prosecution case may read to the jury everything that may have been published in reputable or disreputable sheets concerning the plaintiff.

Upon motion for a new trial the plaintiff filed several affidavits setting forth that one of the counsel for the defendant, during the trial, sat very near to the jury, within five feet of one juror; that during the trial this counsel repeatedly made remarks in an undertone, yet loud enough to be heard by the affiants and the front row of jurors.

The remarks stated to have been made were in the nature of derogatory comments upon the plaintiff and witnesses produced by him, and were most improper; indeed it is not too much to say, were such that had the presiding judge known thereof it would have been his duty to deal severely with the offender.

The defendant made no reply to these affidavits; did not offer any denial of the conduct therein set forth.

It is to be presumed that the court below either discredited them or coincided with that which in respect thereto is argued by the defendant in this court, viz., that the plaintiff should have pressed this matter upon the court during the progress of the trial when he first learned of it.

The affidavit sets forth that the court was told during the trial, by counsel for the plaintiff, that such remarks were being made in the hearing of the jury by one of the counsel for the defendant.

It does not appear that this communication to the court was publicly made nor that any motion was, during the trial, made to the court in respect thereto.

Nevertheless we are of the opinion that in the absence of any denial of the imputed conduct, the court might properly, because thereof, have granted a new trial. The charges were not to be indifferently regarded by the defendant nor lightly passed over by the court.

The conduct of the plaintiff when upon the witness stand was unseemly. It was his duty to have conformed to the rules regarding the conduct of witnesses; to have replied to the questions and done besides this, nothing more than insist upon his right to explain his replies to categorical questions. The court should not have permitted any one to be called a liar or otherwise insulted.

The thirteenth instruction given at the instance of the defendant should not have been given; the hypothesis of there having been stated to counsel all the information possessed by the company not being included therein.

The judgment of the Circuit Court is reversed and the cause remanded.