Stubbs v. Mulholland.

STUBBS, Appellant, v. MULHOLLAND et al.

Division Two, March 28, 1902.

1. **Malicious Prosecution:** PROBABLE CAUSE: DISCHARGE: PRIMA FACIE EVIDENCE. Revised Statutes 1889, section 4036, provides that a prisoner shall be discharged if no offense has been committed, or there is no reasonable cause for charging the prisoner therewith. Section 4403 provides that costs in a prosecution in which the prisoner is discharged by the magistrate shall be taxed to the prosecutor unless the magistrate certifies that there was probable cause for the prosecution. *Held,* that the discharge of a person charged with a penitentiary offense, was prima facie evidence of a want of probable cause, though the magistrate certified that there was probable cause for the prosecution.

2. ————: MALICE AND WANT OF PROBABLE CAUSE: MUST CONCUR. Malice on the part of the prosecutor, and want of probable cause for the prosecution, must concur, in order to constitute malicious prosecution.

3. ————: INFERENCE OF MALICE: BURDEN. Where there is evidence of want of probable cause, the burden is on the defendant to rebut any inference of malice arising therefrom.

4. ————: KNOWLEDGE OF FACTS: DEFENDANT CHARGEABLE. The defendant in an action for malicious prosecution is chargeable with having all the knowledge of the facts before the prosecution was instituted which he could have learned by due diligence.

Stubbs v. Mulholland.

5. ———: DOES EVIDENCE SHOW MALICE: QUESTION FOR JURY. Where evidence showing want of probable cause is introduced, and defendant introduces no evidence, the question whether the evidence shows malice is for the jury.

6. ———: CHARACTER OF ACCUSED: NEGLIGENCE OF PROSECUTOR. The failure of defendant or his agent to make inquiries as to plaintiff's character before his arrest, when in a position so to do, is negligence from which malice may be inferred.

7. ———: INVESTIGATION: PRINCIPAL AND AGENT: ESTOPPEL. Where a person instituting a criminal prosecution accepts the voluntary services of another in investigating the matter, and acts on his advice in instituting the prosecution, he is estopped from denying the agency of the person making the investigation, and is bound by his failure to make proper inquiries, or to communicate material information to the principal.

8. ———: ———: ———: FAILURE TO TAKE ADVANTAGE OF KNOWLEDGE: MALICE. Where a person whose name is forged to a check offers to assist the person who was swindled thereby in finding the offender, and could have informed the latter that the signature was not in the handwriting of the person arrested therefor, the failure to take advantage of such offer before the arrest was negligence sufficient to show malice.

9. ———: ARREST: RECKLESS AND UNREASONABLE: MALICE. Proof of the arrest of a person recklessly and unreasonably, and in gross disregard of his right, is sufficient to show malice, without evidence of ill will, malevolence, or revenge, though evidence of such feelings is admissible.

10. ———: ADVICE OF ATTORNEY: NO DEFENSE UNLESS CERTAIN FACTS SHOWN. The mere fact that a duly licensed attorney is consulted before commencing a criminal prosecution, and advises the prosecution, is not a defense to an action for malicious prosecution, where it is not shown that the attorney was competent and so considered in the community to give advice in legal matters.

11. ———: NEGLIGENCE OF PROSECUTOR: IDENTITY OF DEFENDANT: ADVICE OF COUNSEL: NO DEFENSE. Where a person commencing a criminal prosecution is negligent in ascertaining the facts concerning the guilt of accused, and the identity of defendant is the sole question to be considered, the advice of counsel to commence the prosecution is not a defense.

12. ———: JUSTICE OF PEACE: WARRANT OF ARREST: WITHOUT CLERK'S CERTIFICATE: NOT GOOD IN ANOTHER COUNTY. A justice's warrant is-

sued within one county, which does not contain the certificate of the clerk of the county court where the same was issued that the officer issuing it was authorized so to do, or the signature of a magistrate authorized to issue a warrant in another county, on proof of the signature of the officer issuing the warrant, as required by Revised Statutes 1899, section 2444, is a nullity outside the county in which it is issued, and does not authorize an arrest.

13. ———: ARREST UNDER INVALID WARRANT: EVIDENCE OF MALICE. An arrest under an invalid warrant is evidence of malice in an action for malicious prosecution.

14. ———: ———: NEGLIGENCE OF ATTORNEY: EVIDENCE OF CLIENT'S MALICE. The negligence of an attorney advising a criminal prosecution and drawing the complaint, in permitting the arrest of accused, 300 miles outside the county, on a warrant invalid outside the county, is evidence of malice on the part of the client.

15. ———: ———: ISSUANCE OF WARRANT: INSTRUCTIONS TO OFFICER: EVIDENCE. Procuring the issuance of a warrant for the arrest of a suspected criminal, and delivering it to an officer, with instructions that it is not to be used unless the officer is satisfied that the person named therein is the guilty party, is sufficient evidence of malice to support an action for malicious prosecution.

16. ——— ———: EVIDENCE OF MALICE. Where a suspected criminal is arrested under an invalid warrant sworn out by one having no reasonable cause to believe defendant guilty, the act of placing defendant in jail while a friend is procuring bail, and in violation of a promise not to do so, is evidence of malice.

17. ———: ———: JURISDICTION OF COURT: ESTOPPEL. The defendant in an action for malicious prosecution, who procured the arrest of plaintiff under a void warrant, will not be heard to question the jurisdiction of the court issuing the warrant and discharging the prisoner, as not showing a valid prosecution.

18. ———: ———: ———: NO DEFENSE. The invalidity of a warrant, or the want of jurisdiction of the court issuing it, does not constitute a defense to an action for malicious prosecution based thereon.

19. ———: EVIDENCE: SHOWING GUILT OF THIRD PERSON: INADMISSIBLE. Evidence tending to show the guilt of a third person for the crime for which plaintiff was arrested is inadmissible, as plaintiff's innocence is not in issue.

20. ———: MALICE: WANT OF PROBABLE CAUSE: QUESTIONS FOR JURY. Where there is evidence of malice or want of probable cause, such issues are for the jury, and can not be taken from them by a peremptory instruction of the court.

Vol 168 mo—4

Appeal from Clay Circuit Court.—*Hon. E. J. Broaddus,*
Judge.

REVERSED AND REMANDED.

*Botsford, Deatherage & Young* for appellant.

(1) The fact that justice Case discharged the plaintiff on
the charge of forgery after hearing the evidence proves the
want of probable cause for the prosecution.   Brant v. Higgins,
10 Mo. 734; Casperon v. Sproule, 39 Mo. 40; Fugate v. Miller,
109 Mo. 285; Ray v. Goings, 112 Ill. 656.   The duty of a jus-
tice of the peace under the statute is to commit where there is
probable cause to believe the accused guilty and to discharge
where there is a want of probable cause.   R. S. 1899, sec.
2456.   (2) By probable cause is meant a reasonable ground
for suspicion supported by circumstances sufficiently strong in
themselves to warrant a cautious man in the belief that the
accused is guilty of the offense with which he is charged.   It
must be something more than bare suspicion or surmise.   Mc-
Garry v. Railroad, 36 Mo. App. 347; Sharpe v. Johnston, 76
Mo. 660; s. c., 59 Mo. 557. In this case there was not even any
ground for suspicion of plaintiff.   Much less were there any
circumstances warranting a belief of his guilt, or anywise tend-
ing to prove the same.   Spaulding v. Same, 56 Mich. 366;
Ramsey v. Arnott, 64 Tex. 320; Smith v. Edge, 52 Pa. St. 419;
Hamilton v. Smith, 39 Mich. 227; 14 Am. and Eng. Ency. Law,
26, note 3.   (3) The defendants must be held to have known at
the time they instituted the causeless prosecution against plain-
tiff every fact they could have ascertained by proper diligence
bearing on the question of his guilt.   Pipkin v. Haucke, 15
Mo. App. 373; Hill v. Palm, 38 Mo. 13; Sappington v. Wat-
son, 50 Mo. 83; Sharpe v. Johnston, supra.   Any fact that de-
fendants might have thus ascertained is the same as if they had
actually known it.   (4) The fact that plaintiff was a man of

good reputation for honesty, integrity and industry, both in Scott county, Missouri, where he lived most of his life, and also at Springdale, Arkansas, where he lived about a year, which fact was sworn to by several witnesses, and denied by none, was properly proven in evidence by plaintiff to show the want of probable cause. Woodworth v. Mills, 61 Wis. 57; Ross v. Ennis, 35 Ill. 487; McIntire v. Levering, 148 Mass. 546; Peck v. Chouteau, 91 Mo. 138; Gregory v. Chambers, 78 Mo. 294; 14 Am. and Eng. Ency. Law, 59. Evidence of good character is a fact admissible in every criminal case to prove innocence. Especially so in cases of doubt and uncertainty. Defendants either knew, or by the exercise of proper diligence could have known, of plaintiff's good character and that he was, therefore, probably not the guilty party. (5) The fact that plaintiff and W. G. Thompson, whose name as payee was forged on the back of the check in question, were partners in business in itself was sufficient to deter defendants, if they had been men of ordinary prudence and regard for the rights of others, from causing plaintiff's arrest. Partners in business do not ordinarily forge one another's paper. Defendants either knew, or by the exercise of proper diligence could have known, of the fact of such partnership. The fact of such partnership relation between plaintiff and W. G. Thompson was in itself of great weight to establish want of probable cause. (6) The prosecution of plaintiff was not only without probable cause, but was also malicious. Malice in its legal sense does not denote anger or ill-will, but a wrongful act done intentionally. 2 Greenleaf's Evidence, sec. 453; Com. v. Snelling, 15 Pick. 327. Malice often consists of a reckless disregard of the rights of others. Hamilton v. Smith, 39 Mich. 222. Malice is inferable from the fact alone of the want of probable cause. Brant v. Higgins, 10 Mo. 728; Callahan v. Caffarata, 39 Mo. 136; Sappington v. Watson, supra; Fugate v. Miller, 109 Mo. 281. (7) The issuance of the warrant, with the understanding that defendant Hughes, the employee

of the principal defendants, should have and exercise the determination whether plaintiff should be arrested thereunder or not, converted Hughes into a judicial officer with the power of the magistrate who issues such writs, in violation of the law of the State (R. S. 1899, sec. 2441) and made the warrant for plaintiff's arrest a searchwarrant, not for the discovery of property, but of a human being. It was in effect the same as the issuance of a warrant in blank with the power given to one who was not a regularly constituted officer to fill in the name of the person whom he might believe to be the guilty party. The issuance of this warrant being therefore unlawful, in violation of plaintiff's rights and in disregard of the time-honored safeguards of the law which have come down from Magna Charta and the bill of rights for the protection of the citizen, was therefore conclusively malicious as a matter of law, irrespective of the intentions of the parties who caused that unlawful act. An act which is unlawful or *per se* wrongful of another is malicious in the eye of the law. (8) It is well settled that the defense of legal advice, even in proper cases, in order to avail must have been procured after the disclosure to the attorney fully and fairly of every fact which the party by proper diligence could have ascertained bearing on the question of guilt of the accused. Pinkin v. Haucke, 15 Mo. App. 373; Hill v. Palm, 38 Mo. 13; Sappington v. Watson, supra; McGary v. R. W. Co., 36 Mo. App. 349; Ray v. Goings, 112 Ill. 656; Murphy v. Larson, 77 Ill. 172; Williams v. Vanmeter, 8 Mo. 339. (9) The questions of intent and malice in both civil and criminal cases are for the jury and not the court. Moody v. Deutsch, 85 Mo. 237; 13 Ency. of Pl. and Pr., 473; Hamilton v. Smith, 39 Mich. 227. (10) Where the credibility of witnesses is involved, a peremptory instruction based on the oral testimony of such witnesses is erroneous. Gregory v. Chambers, 78 Mo. 298; Meyer v. Union Trust Co., 82 Mo. 240; Wolff v. Campbell, 110 Mo. 114; Church v. Railroad, 119 Mo.

203; Land Co. v. Ross, 135 Mo. 107; Seehorn v. Bank, 148 Mo. 256; Gibson v. Zimmerman, 27 Mo. App. 96.

*F. M. Black, A. L. Sherman* and *Simrall & Trimble* for respondents.

(1) Malice and want of probable cause are both essential elements in an action for malicious prosecution. As to this proposition there seems to be no difference of opinion between counsel on the one side and the other. Probable cause has been thus defined by this court: "In our opinion that reasonable and probable cause which will relieve a prosecutor from liability, is a belief by him in the guilt of the accused, based upon circumstances sufficiently strong to induce such belief in the mind of a reasonable and cautious man." Vansickle v. Brown, 68 Mo. 635; Sharpe v. Johnston, 76 Mo. 670; Cooley on Torts, p. 181. Probable cause is a mixed question of law and fact. If the facts are not in dispute the question is for the court, but upon disputed facts the jury must be left to pass. Cooley on Torts p. 181; Weaver v. Flood, 72 Mo. App. 199; Sharpe v. Johnston, 59 Mo. 576. (2) The facts which go to show want of probable cause may and sometimes do furnish evidence from which malice may be inferred, but want of probable cause is not necessarily proof of malice. Both malice and want of probable cause are inferences to be drawn from the facts. Thus it has been said by this court: "If there be reasonable or probable cause, no malice, however, distinctly proved, will make the defendant liable. The proof of malice does not establish the want of probable cause, nor does the want of probable cause necessarily establish the existence of malice. That is to say, malice is not an inference of law from the want of probable cause. Malice, however, need not be proved by direct and positive evidence, but may be inferred from the facts which go to establish the want of probable cause, and this is all that is meant when it is said that malice

may be inferred from the want of probable cause." Sharpe v. Johnston, 76 Mo. 669; Burris v. North, 64 Mo. 426. (3)   If the person causing the arrest does not act on his own judgment, but in good faith lays before counsel all of the facts and circumstances known to him, and then acts upon the advice of counsel thus obtained, that advice is a perfect and complete defense to an action for malicious prosecution. Sharpe v. Johnston, supra; Burris v. North, 64 Mo. 429; Cooley on Torts, p. 183.

SHERWOOD, P. J.—Action for malicious prosecution. The defendant banking company, of which defendant John Mulholland is president, and the other defendants were employees, is a business concern, whose chief, if not exclusive business consists in buying laboring men's time; that is, by discounting their pay checks, etc.   The calling seems to have been remunerative, as they employed at a salary A. L. Sherman as a lawyer to attend to their legal business and gave him deskroom in their banking office.

J. H. Stubbs, the plaintiff in this action, testifying in his own behalf, in substance stated that he was thirty years of age; that he had never been in Kansas City until brought there on a warrant of arrest in April, 1897, from his residence in Scott county (Blodgett).   He had formerly lived in that county; lived there somewhat over twenty years, having arrived there from Eddyville, Kentucky, when a boy nine years old.   On his arrival in Scott county, he worked on a farm until October, 1888, when he was employed in the store of Marshall, McMillan & Company of Scott county in their dry goods department; that his physician, thinking he had Bright's disease, advised his removal from Scott county to Springdale, Arkansas, and recmended the water for his complaint; that accordingly he removed there with his family, consisting of a wife and two children, and went into the grocery business with W. G. Thompson, A. L. Thompson and Chas. Stubbs, his brother, and

remained in Springdale, living with his family, a wife and two children, from January, 1896, to December 1 of that year; that regaining his health, and business being very dull, and being solicited by his old employers, Marshall Bros., to return to Missouri, they offering him an interest in their business, should he do so, he accepted their offer, and went back with his family to Scott county, Missouri. It was generally known in Springdale that plaintiff contemplated leaving there with his family to return to Scott county, Missouri; that prior to his being brought before Justice Case on a charge of forgery, he never saw the $75 check on which he was charged with forging the name of W. G. Thompson (the payee in the check), by indorsing his name thereon; that he never indorsed Thompson's name on that check; that prior to his arrest, detective Kinney never called on him for information and no one else ever made inquiry of him about the matter contained in the charge; that he was under arrest from Friday of one week to Thursday of the next; that when brought to Kansas City he was locked up in jail, being in jail about thirty minutes; that witness requested officer Hughes, one of the defendants, to allow witness to give bail before being taken to jail; that it was understood that witness was to be permitted to give such bond but that witness was taken to jail notwithstanding said agreement.

He also testified as to expense he had incurred.

The complaint filed on April 21, 1897, by one of defendants, Thos. A. Barber, charged plaintiff with forging the name of W. G. Thompson on the following check: "Treasurer of the Atchison, Topeka, & Santa Fe Ry. Co. Pay to the order of W. G. Thompson ($75.00) seventy-five dollars in full payment of wages for May, 1896. J. Moore." Indorsed on the back as follows: "W. G. Thompson."

The forging was charged to have been done in Jackson county, Missouri, on the — day of June, 1896, in order to defraud the John Mulholland Banking Company, a corporation.

The warrant issuing on the complaint, was served by Patrick J. Hughes, D. C. special officer arresting plaintiff on April 23, 1897, at Blodgett, in Scott county.

On hearing had on April 28, 1897, justice Case adjudged plaintiff not guilty and discharged him. At the trial, Mulholland, Barber and Hughes all testified against plaintiff.

Hughes, who made the arrest, had been in the employ of the John Mulholland Banking Company since May, 1893, and his time went on while absent going to Scott county, making the arrest and returning with the prisoner. Sherman was the general attorney of the banking company, and with his knowledge and under his directions, Hughes got himself appointed special deputy and went and arrested and brought plaintiff from Scott county; Barber, defendant, who made the complaint was working on a salary for the banking company; he was cashier and secretary.

It was testified by A. L. Thompson, father of W. G. Thompson (both of whom were plaintiff's partners) that plaintiff, during the month of June, 1896, was continuously at Springdale, Arkansas, except when he went fishing two or three times, a distance of seven miles, and once up to Rogers, distance ten miles, on business for the company, and with those exceptions he was at Springdale all the time from April to November. That on those little excursions plaintiff was not gone long enough to have gone to Kansas City and returned.

The books of account of said grocery firm being produced, witness testified that the entries in that book in the month of June, 1896, were made by witness, Floyd Thompson, W. G. Thompson, Chas. Stubbs and Joseph H. Stubbs and another party, who had been delivering goods, by the name of Dodson; that witness knew the handwriting of plaintiff Stubbs and identified certain entries made in said books of account by plaintiff Stubbs in June, 1896. Witness further testified that W. G. Thompson had a separate postoffice box from the box of the

grocery firm; that mail of said W. G. Thompson was not received or deposited in the firm's box.

Chas. Stubbs, brother of plaintiff, confirmed what A. L. Thompson had testified regarding plaintiff's continued presence in Springdale, with the exception of the short excursions aforesaid; that both plaintiff and witness sold goods in the store at Springdale, Arkansas, during the month of June, 1896, and that, in the opinion of witness, plaintiff was in the store at that place every day during the month of June.

W. G. Thompson, whose name plaintiff had been charged with so forging, testified that he lived at Springdale, Arkansas; that he was the payee in said check; that he was then and had been in the employ of the Atchison, Topeka & Santa Fe Railroad Company, and was at the time of the issuing of that check in June, 1896; that he had been in the employ of that company since 1892; that he knows the handwriting of plaintiff Stubbs, and has known it since January, 1896; that the signature of W. G. Thompson on the back of that check is not the handwriting of plaintiff, and is not the handwriting of the witness; that witness had correspondence with the general officers of the Atchison, Topeka & Santa Fe Railroad Company respecting the non-appearance and loss of this check; this check was issued in June, 1896, for the services of witness in May, 1896; said check reads as follows:

"Treasurer of the Atchison, Topeka & Santa Fe Ry. Co., office. Pay to the order of W. G. Thompson, seventy-five ($75.00) dollars, in full payment for wages for May, 1896.
                                        "J. MOORE, Paymaster."

Witness W. G. Thompson further testified that he bundled up and sent to Mr. Kinney, the detective of the Atchison, Topeka & Santa Fe Railroad Company, and who was a

witness at the trial below of defendants', all the letters and papers relating to said check. Witness further testified that he also lost another check issued in September, 1896; that said detective Kinney wrote him asking what information he had about the voucher of said checks, and that witness responded to said letter that he could not give him any information at all. He further testified that he had a mail box (No. 56) in the postoffice, at Springdale, Arkansas, where he resided, which box was rented by his wife; that this box was used for witness's individual mail and the mail of his family. Witness testified that if the envelope containing said June, 1896, check, payable to his order, had ever left the office of the Santa Fe company at Topeka, and had arrived at the postoffice at Springdale, it would have been, in the regular course of business, deposited in said box No. 56; that nobody except himself and wife and immediate family had access to that box; that witness is the son of A. L. Thompson, who was living at Springdale at that time, carrying on a grocery business; that said grocery business was carried on by plaintiff, Joseph H. Stubbs, Chas. Stubbs, A. L. Thompson and himself, W. G. Thompson, as partners in said grocery business; that said partnership firm had a separate mail box of their own in the postoffice at Springdale for the reception of the said firm mail; that said firm carried on said grocery business from January, 1896, to November, 1896; that witness being employed in the service of the Atchison, Topeka & Santa Fe Railroad Company, he, the witness, was represented in said firm by his brother, Floyd Thompson; that plaintiff, Joseph H. Stubbs, while being a partner in said firm, lived in Springdale with his family, composed of his wife and little girl and boy, and that while plaintiff lived at Springdale he enjoyed in that community a good character and reputation, and was an industrious man of good habits. Witness further testified that if detective Kinney had shown him (witness) the check in question made in June, 1896, he could have readily stated to said Kinney that the signature

of W. G. Thompson on the back of said check was not in the handwriting of Stubbs, the plaintiff, as he is able to state now. Witness afterwards received a duplicate check by means of which he received his May wages. Witness further testified that he had not lost any pass.

John Mulholland, president of the defendant banking company testified to the effect following:

Hughes is the outside man and collector; that the witness knew when Hughes went to arrest plaintiff; that Hughes consulted him (witness) before he went; that witness instructed Hughes to consult with Sherman; that after plaintiff Stubbs was arrested and brought to the Savoy Hotel in Kansas City, the witness went to the Savoy Hotel and identified Stubbs. On cross-examination, witness Mulholland, in response to questions by his counsel, testified to the circumstances of passing of said check on his bank. His statement was that this check was presented to the bank by *a stranger without identification and cashed by the bank.* This was late in the day, on some day in June, 1896. The check came back to the bank in September or October, 1896, with the claim that it was a forgery, and Mr. Barber of the bank refunded money while witness was absent in New York. Witness further testified on cross-examination that he had a conversation with detective Kinney, that he told detective Kinney that the man who presented his forged check was five feet, seven or eight inches high, rather dark complexioned, small mustache, not very heavy, and dressed in a business suit of clothes like a railroad clerk is usually dressed; that afterwards he again saw said Kinney and Kinney told him that he had been down at Springdale and *looked at the man himself, meaning plaintiff Stubbs,* and made inquiry of the postmaster and a banker there, and showed this check to the banker, and the banker said it looked very much like Stubbs's writing; that Kinney had the check and took it there with him; that Kinney told witness that the postmaster at Springdale told him that Stubbs had said that he could imi-

tate the handwriting of Thompson; that witness turned the matter over to Hughes with the direction that he go down and see Sherman, their general attorney; that Sherman advised witness to have Stubbs arrested; that witness, after Stubbs was arrested and brought to Kansas City, went over to the Savoy Hotel and identified him as the man who had presented the check.

On re-direct examination, defendant Mulholland testified that he did nothing further in the prosecution of plaintiff Stubbs, after he was discharged by the justice of the peace; that neither the witness nor Barber nor Hughes went before the grand jury, and that defendants did nothing more in the prosecution of Stubbs after he was discharged by the justice; that he had learned a man in the office of the Santa Fe company at Topeka had been discharged because he was suspected of rifling the letters containing these checks payable to W. G. Thompson; that he had been told by Kinney that this man, an employee of the Santa Fe company, was discharged because he was suspected of rifling those letters. That he had made no complaint against this man who was discharged by the company. The witness further testified that from the time of the presentation of this check in June, 1896, to the filing of the complaint, he never saw the man that he believed was the man that presented that check; that he came to the conclusion that plaintiff Stubbs was the man from the information that Kinney gave him, and the fact that plaintiff Stubbs answered the description of the man, being about five feet, seven inches high; that the witness had seen a good many men of that height; that so far as witness knew neither Barber nor Hughes ever saw the man that committed the crime between the time of the commission of the crime and the filing of this complaint; he did not know anything about Joseph H. Stubbs except what he learned from Kinney; he got the same information from Kinney about the discharge of this clerk in the Santa Fe office; he never

had this man in the Santa Fe office arrested after learning the fact that he was the man. Witness being asked the question whether it was not because of the pendency of this suit that he had refrained from causing the arrest of the clerk at Topeka, who had been discharged by the Santa Fe company for the commission of this crime, answered:

"No, sir; I had one man arrested whom I believed forged the check, and I will have no other man arrested."

["The time when Kinney made the report to witness of what he had seen at Springdale was about a week before the beginning of this prosecution; Kinney told him at the time that he was the man and that his name was Stubbs; as I recollect it he told me that he had seen Stubbs at Springdale, Arkansas."]

After Kinney had testified, Mulholland changed his testimony as to what is placed in brackets respecting Kinney's statement:

"Q. I don't know whether I understood you right or not; I understood you to say when Mr. Kinney came back from Springdale that he informed you that he saw Mr. Stubbs there at Springdale? A. He either said that or said that Mr. Stubbs answered the description of the man. My recollection is one of those two things; he either told me that he saw him or that my description answered the description of Mr. Stubbs; I am not clear as to the positive statement that he had seen Mr Stubbs or whether he answered the description."

That the witness swore before the justice of the peace that this forgery was committed on June 14, 1896; that he afterwards changed his testimony and fixed it on June 15, 1896. Witness further testified that defendants Hughes, Barber and himself each went to the Savoy Hotel after Stubbs was brought there and identified him as the man; there was about ten minutes interval between our several identifications; possibly half an hour. Neither Barber, Hughes nor myself had seen the man prior to his arrest; we identified him at the Savoy

Hotel; I went over there on purpose to identify Stubbs; that the substance of his testimony before the justice was that he went in and stated the circumstances of the forgery, the commission of the crime itself, how the money was obtained, followed by a statement that he had seen this man at the Savoy Hotel and that he was the man.

John E. Marshall, state senator, and member of the firm of Marshall, McMillan & Company, of Scott county, Missouri, gave testimony to the effect that he had known plaintiff for twelve or thirteen years; when first knew him he was on a farm; that he had had plaintiff in his employ from 1888 to 1895; that plaintiff was an honest, sober and industrious man; character as citizen was good prior to his arrest; that the arrest had injured plaintiff in remote parts of the county where people did not know him; but not with witness; that plaintiff had, since the arrest, served witness as before; that witness tendered to Hughes and Gorman, who arrested Stubbs in Scott county, a bond for his appearance; that Stubbs was brought to Kansas City under protest, as he wanted to give a bond in Scott county. That Stubbs was in jail in Kansas City; that when the witness and Stubbs and the party arrived in Kansas City at the Savoy Hotel witness went to get a bond; that *they promised witness that they would hold Stubbs there until we filed this bond; when we arrived back at the Savoy Hotel they had taken him to jail;* afterwards we got bond and he was released.

Defendant Hughes was recalled to testify on behalf of defendants, and doing so stated that after receiving directions from Mulholland he went to Sherman, general attorney of the bank. After arriving at Scott county, Missouri, where plaintiff Stubbs lived, witness found Stubbs and identified him as the man he thought had passed the forged check in Kansas City in June, 1896; that witness made no inquiry as to what the reputation of Stubbs was, either in Scott county or Springdale; that he made no inquiry of Mr. Kinney as to what Stubbs's reputation was; that witness had no information from

W. G. Thompson at the time of making this arrest; that witness had no knowledge prior to this arrest as to what W. G. Thompson, payee in this check, would say as to whether Stubbs had signed W. G. Thompson's name on the back of the check; that he did not know what Thompson would say, as he had never seen the man; that he took no thought of Stubbs's connections, his family or his character; that he did not know that Stubbs had a good character at the time he arrested him; that witness never made any inquiry about Stubbs's character. Witness further testified that after bringing Stubbs to the Savoy Hotel in Kansas City, he went to the office of the defendant bank and there met Barber and Mulholland; that witness stayed at the office and Barber went over to the hotel, and Mulholland went over afterwards; that they wanted to pick this man out separately; that it was talked about among us three, that is, Barber, Mulholland and myself, that they would go over separately and identify the man; that was the understanding between us; if it was not, we would have gone together.

The testimony of Gorman, the detective under Kinney, is in line with that of Hughes as to the entire absence of any precaution being taken as to the identification of plaintiff, as the forger who indorsed the checks payable to W. G. Thompson. The station agent at Blodgett pointed out to him, "Joe Stubbs," and the functionaries from Kansas City spoke to him, and took a drink of beer with him, and without making a single inquiry of him, or of those with whom and among whom he had lived for so many years, without disclosing their purpose, arrested plaintiff, and refusing to take bond, incontinently hurried him off on the cars to Kansas City.

Detective Kinney's testimony was in behalf of defendants, in substance and effect this:

That he resides at Topeka, Kansas, and is special agent for the secret service of the Atchison, Topeka & Santa Fe railroad; that in February, 1897, he called on defendant Mul-

holland, and obtained the check in question which had been passed on them in June, 1896; that he obtained at that time a description of the man who passed the check as being a man about five feet, seven or eight inches high, sallow complexion, dark mustache, dressed in a business suit of clothes and looked very much like a railway clerk or railway man; that afterwards witness went down to Springdale, Arkansas, to investigate the matter; that Springdale is a small place, a village; that he there called on Mr. Davis, the postmaster; that the postmaster informed him that the grocery firm composed of Thompson and Stubbs had a postoffice box in which all of the company's mail was put; that witness also learned from the postmaster that Mrs. Thompson had a lock box of her own and that he was informed by the postmaster that he put Mr. Thompson's mail in this box of Mrs. Thompson's; that he had an interview with Mrs. W. G. Thompson in which she related to him why she kept this separate lock box for the reception of the mail of herself and Mr. Thompson, her husband. Witness testified that he described the party who cashed the check as given him by Mulholland and that he asked Mrs. Thompson if any member of the firm answered that description; that she stated that answered the description of Joe Stubbs. That while there witness called on the cashier of the bank; that the cashier stated to him that Stubbs was in the habit of talking about his ability to imitate signatures; that witness did not find Stubbs at Springdale; that witness was informed that Stubbs, after closing out his connection with the firm had moved back to Missouri; that witness did not see either the elder Thompson or his son while at Springdale. Witness understood that the sons were at Port Arthur; that the witness had received a letter from W. G. Thompson dated March 22, 1897, relating to this matter; that after he returned to Kansas City witness made a report to Mulholland.

The account of the witness, Kinney, as to what he related

to Mulholland on his return is contained in the following question and answer:

Q.   Recite here and state in your own way what was told Mr. Mulholland that you had learned?   A.   I called at Mr. Mulholland's office, found him there and I told him that I had been at Springdale, Arkansas, and I believed that I had located the party, or located the man, I believe was the language I used, and I went on and related to him about my investigations at the postoffice and about my learning that Mr. Stubbs was connected with the firm there and had the combination to the postoffice box of the firm and that he answered the description of the party who cashed the check, and that he was in position, by reason of his being a member of the firm and having the combination to the box, to have gotten in that box and gotten the letter containing this check.   I says, "the chances are he is the party;" I says, "I am sufficiently satisfied of it; that I feel some one who knows him ought to be sent to Blodgett to look at him before we proceed any farther with this investigation;" I says, "Do your people say they can identify the man?"   I says, "I believe this is the proper thing to do, to send a man there to look at Mr. Stubbs;" I says, "if he is the man you can bring him back, if not there is no harm done, we can look further."   Mr. Mulholland then called Mr. Hughes and Mr. Barber up; they talked the matter over and he says to Mr. Hughes, "take it up to Sherman and have him go to the county attorney with it."

Witness further testified that Mr. Mulholland said he would have the matter taken up and have Hughes go to Blodgett to look at this man.   This place, Blodgett, is where Stubbs lived in Scott county.

On cross-examination the witness, Kinney, testified that he was present at the trial before the justice, but did not testify; that he saw the Springdale postmaster present as a witness in this case at the last term of court; that witness remem-

Vol 168 mo—5.

bered Davis was present as a witness; that witness did not ask the postmaster at Springdale anything about the good character of Stubbs; that he did not ask Mrs. W. G. Thompson anything about the plaintiff's good name and character; that he did not ask the cashier of the bank at Springdale anything about the good character or reputation of the plaintiff; that witness had this $75 check in his possession for some time; that W. G. Thompson, the payee in the check, was and is an employee of the same company with the witness; that witness did not take that check to W. G. Thompson and did not show it to him; that witness learned that said W. G. Thompson was in partnership with plaintiff Stubbs at Springdale in the grocery business.  Witness being asked the question, "Did you form an opinion in that way that W. G. Thompson would be familiar with the handwriting and would say whether that was Stubbs's signature or not?" said, "I did not look at it in that way." That witness had the check in his possession for about three months and witness failed to answer the question whether he could have gotten Mr. Thompson at any time to meet him and give an opinion as to whether that signature was in the handwriting of Stubbs, his partner in business; that witness did not tell Mulholland whether he had gotten to see Thompson, his fellow-employee, the payee of this check, and had asked him whether this handwriting on the back of that check was in the handwriting of Stubbs; that he did not tell Mulholland this for the reason that he had not done anything of the kind; that he did not think it was necessary to take this check to W. G. Thompson to ascertain whether his partner in business had forged his name on the back of the check.  In answer to the question, "Did you tell Mulholland you thought Stubbs was the man?" witness answered as follows:  "I said I believed he was because he was in a position to have the check."  That was the best information we had up to date it was worth while to run down.

"Q.  He had the opportunity and therefore he was the

man? A. I did not say he was; it was for the people to identify him and say whether he was or not.

"Q. You think then that men who are partners in business and have chances to forge their partners' names are given to forgery? A. If they have no opportunity they can not commit the crime and I have known partners gifted in such things."

Witness further testified that he never saw Stubbs prior to his arrest; that he understood from Mulholland that nobody had seen the man that committed the crime from the time of the commission of the crime to the time witness made said report. Witness swears positively that he never saw plaintiff, Stubbs, prior to his arrest; that he understood that neither Mulholland, Barber, Hughes nor Gorman had seen the man they thought committed this crime from the time of its commission to the time of the arrest. Witness further testified that the September, 1896, check of Thompson was also lost and that witness looked that up at the same time. That there was a man in the treasurer's office of the Atchison, Topeka & Santa Fe Railroad Company at Topeka, by the name of Mason, and the witness testified that the parties cashing the second check positively identified Mason as the man. Mason was employed in the office of the company where these checks were mailed; that Mason has not been prosecuted for the offense; that witness brought this man Mason down to Kansas City in September, 1897; that Mason was taken to Mr. Dreyfus of the Eagle Clothing Company, which had sold this Mason an overcoat; that Dreyfus identified Mason as the man who had purchased the overcoat from him.

In explanation of why the witness made no inquiry as to the character and reputation of Stubbs, he answered as follows:

"A. I didn't make any inquiry into the reputation or character of the man because I didn't know who committed this offense; the parties paying the check claimed they could identify the man, and my instructions were to assist the

parties who were the losers—that is, the party who paid the check—to assist them in every way I could to locate the guilty parties; our company was not any loser at all; they turned over the check to the parties and issued a duplicate, and for that reason I did not think it necessary to inquire into his character."

The following question and answer was also propounded and given by the witness Kinney:

"Q. You tell this court and jury you couldn't have gotten Mr. Thompson any time you desired him and have him come home or meet him at some point and gotten his opinion as to whether that was the handwriting of Mr. Stubbs, his partner in business? A. In explanation of this, I have several hundred or thousands of other cases to attend to and I couldn't permit my business to be closed. out with this one case; I gave Mr. Mulholland all the information I got at Springdale and asked him to identify him, and see if he was the man."

Defendant Barber, testifying on part of defendant, stated that he was manager of John Mulholland Banking Company, and was secretary in June, 1896; that the man who passed the forged check, came into the office at the bank about five o'clock in the evening; he had nobody to identify him and I referred him to Mr. Mulholland; he showed Mr. Mulholland some letters and Mr. Mulholland sent him back to me and told me to cash the check, which I did. That was June 13, 1896. The check came back September 8, 1896. The man who presented this check was about five feet, seven or eight inches high, dark, and had a small dark mustache and dark hat and cutaway coat; I gave his description afterwards to Mr. Kinney, and the check was turned over to Kinney at that time; Kinney afterwards went to Springdale, Arkansas, and told us upon his return about Thompson being in business with Stubbs, and Mrs. Thompson having a private postoffice box of her own; that when plaintiff Stubbs was brought back to Kansas City,

witness went to the Savoy Hotel; that he pointed out Stubbs there as being the man; that witness was told Stubbs was in the hotel lobby or in the hotel; that witness went in there with those men and told them he thought this was the man who appeared later at our office and cashed the check; that witness never saw that man that cashed the check after the check was cashed until the trial; that witness does not know how it happened that he and Hughes and Mulholland all went separately to the hotel to identify this man; that before going to the Savoy Hotel the witness had information that plaintiff Stubbs was over at the hotel; that Hughes had told him.

Ray Smith, assistant prosecuting attorney of Jackson county, testifying for defendants, stated that Mr. Wright, acting as the representative of defendant, for the most part conducted the prosecution of plaintiff before justice Case.

The testimony of A. L. Sherman, the salaried attorney of the banking company, was that Mulholland had talked to him about the case in March or April, 1897; that then Hughes and Gorman told him more particularly the circumstances of the case. The substance of Sherman's testimony is the following:

Q. State what information you received from them during those different conversations? A. This conversation was over a year ago; but they stated to me that one W. G. Thompson, who was an employee of the Santa Fe Railroad Company, that his home was at Springdale, Arkansas; that his wife lived there, but he was on the road a great deal of the time in the discharge of his duties as an inspector for that company; that he had failed to get his checks for the months of June and September, 1896; that he claimed those checks had been forged; that he made complaint to the headquarters at the treasurer's office of the Santa Fe Railroad Company, and made complaint his name had been forged to certain checks; Mr. Hughes had with him this $75 pay check issued to Mr. Thompson, and offered in evidence here—showed me that check and the indorsement on it and stated further that

Mr. Kinney, under whom Mr. Gorman was working, had been to Springdale, Arkansas, looking up this matter as the agent of the railroad company, and that he had found that a man by the name of Joseph Stubbs was formerly a partner of Thompson & Company, of Springdale, Arkansas, and that Mr. Stubbs there had access to the drawer that contained the mail of W. G. Thompson, and we discussed there the likelihood or probability of Mr. Stubbs having opened this mail and taken out this check that was addressed to Mr. Thompson—sent to his wife probably or to the firm probably; he said Mr. Kinney, a man of experience in these matters, said that he expected or believed this man Stubbs was the guilty man; that he had moved away from Springdale, but was now in southeast Missouri; stated further that he talked with the postmaster, and that the postmaster went with him to Thompson's wife and he asked Mrs. Thompson about letters and passes; they asked her if he ever lost any of his passes, and she looked over the passes and she found one missing; I took that as a link; and further, he saw the clerk or cashier of the bank there and that he stated Mr. Stubbs was very free—an expert in the use of the pen—and he, Stubbs, stated to the cashier that he could write Mr. Thompson's name as good as he could himself —something to that effect; I took all those together and finally advised Mr. Hughes that I thought he had a case; further, I had omitted to say that he said Kinney had said he found in talking to parties down there, that Stubbs's description tallied with the description Mr. Mulholland and all these gentlemen had given him of the man; taking this altogether, I advised them to swear out the warrant; they wanted to know what was necessary to be done; I says, "You will have to go before a justice of the peace, make complaint, charging him with this forgery," which I did proceed to do—prepared the complaint and Mr. Barber signed it.

Q. You got out all the facts, asked questions, and so on? A. Yes, sir, I tried to get all the facts.

The warrant on which plaintiff was arrested in Scott county did not have indorsed thereon, or annexed thereto, by the clerk of the county court of Jackson county, his certificate, with the seal of the court affixed thereto, that the officer who issued such warrant was at the time an acting officer fully authorized to issue the same, and that his signature thereto is genuine, nor was there made to any magistrate of Scott county proof of the handwriting of justice Case, and then such warrant indorsed with the name of such Scott county magistrate as is provided in section 2444, Revised Statutes 1899, formerly section 4024, Revised Statutes 1889.

Defendants interposed no demurrer to the evidence.

This was in substance the evidence in the case.

Whereupon, the court, over the objection and exception of plaintiff, gave this peremptory instruction:

"The court instructs the jury that under the law and the evidence in this case the jury must find for the defendants."

Thereupon plaintiff took a nonsuit with leave, etc., and having moved unsuccessfully, comes here on appeal.

The evidence has been thus fully set forth, because necessitated by the action of the trial court in giving the quoted instruction, which action, being examined by the light of that evidence, and of the authorities pertinent thereto, will determine whether the ruling of the trial court on the point mentioned, was correct or otherwise.

1.   And, first, as to the discharge of plaintiff by justice Case after examination had.

At the time of such examination, to-wit, April, 1897, section 4036, Revised Statutes 1889, now section 2456, Revised Statutes 1899, was in force, which reads this way:

"If, upon the examination of the whole matter, it appear to the magistrate either that no offense has been committed by any person, or that there is no probable cause for charging the prisoner therewith, he shall discharge such prisoner."

So that, as plaintiff was discharged, the conclusion must

have been reached by the justice, "that there was no probable cause for charging the prisoner therewith."

But our attention is called by defendants' counsel to section 4403, Revised Statutes 1889, where it is enacted:

"If a person charged with an offense punishable with death or imprisonment in the penitentiary alone shall be discharged by the officer taking his examination, or if he be recognized or committed for such offense, and no indictment be found against him, the costs shall be paid by the prosecutor or person on whose oath the prosecution was instituted, and judgment shall be rendered therefor as provided in the next two preceding sections, unless the officer taking the examination, or the grand jury before which the same is investigated, shall certify that there was probable cause for the prosecution, in which event the costs shall be paid by the State." That section was repealed in 1899. [See sections 2835, 2836, R. S. 1899.]

And counsel assert that inasmuch as the magistrate, upon discharging the prisoner, as shown by his docket, did certify thereon, in addition to the fact of such discharge, "there being probable cause for this prosecution, it is ordered and adjudged that the State of Missouri pay the cost herein taxed at twenty-six dollars and forty-seven cents," that therefore, and thereby, probable cause was shown for plaintiff's prosecution.

In other words, to reduce the proposition of defendants' counsel and all reasonable inferences deducible therefrom, to their simplest form of expression, and to their last analysis: Inasmuch as the discharge of the prisoner under section 4036 showed that there was "no probable cause for charging the prisoner therewith," and as the magistrate had certified that there was "probable cause for the prosecution," that therefore there were at the time of the entry on the docket aforesaid, *two* probable causes simultaneously existing, one that the prisoner was *not* guilty; the other that he *was!* This result has rather the appearance of being a *reductio ad absurdum.* But

counsel have failed to note such a conclusion from their premise, although it is indubitably a just one.  And we here venture to suggest that there is quite a wide swath of difference between "no probable cause for charging the prisoner" with the offense, and "probable cause for the prosecution;" and that the latter may be entirely consistent with the former, asserting, as it impliedly and necessarily does, that though no ground existed for charging and holding the *prisoner;* and hence his discharge, yet that there *was* ground for *instituting the prosecution*, though the real criminal escaped apprehension. And apart from this suggestion, even if the words were more obscure in their meaning and more improvidently selected to convey what was intended, still, it would be our duty under a familiar canon of construction, which requires that the letter of a statute be enlarged or restrained, according to the true intent of the framers of the law, so to construe the meaning of the clause of section 4403 on which defendants rely, as to let the reason of the law prevail over its letter, and so limit general terms in their application as not to lead to injustice, oppression or an absurd consequence, the presumption being that the Legislature intended no such anomalous results. [Whitney v. Whitney, 14 Mass. 92; State ex rel. v. Emerson, 39 Mo. 80; State ex rel. v. King, 44 Mo. 283; Riddick v. Walsh, 15 Mo. 519; United States v. Kirby, 7 Wall. 482; People ex rel. v. McRoberts, 62 Ill. loc. cit. 41; Fusz v. Spaunhorst, 67 Mo. 256; State v. Hayes, 81 Mo. loc. cit. 585; Railroad v. Brick Co., 85 Mo. loc. cit. 329; Ex parte Marmaduke, 91 Mo. loc. cit. 254; Bingham v. Birmingham, 103 Mo. 345; Sutherland, Stat. Constr. secs. 218, 219; United States v. Freight Assn., 166 U. S. loc. cit. 320, and cas. cit.]

An earlier authority states the doctrine more tersely: "For the letter killeth, but the spirit giveth life." [2 Cor., 3:6.]

2.  Under section 4036, supra, as well as under the authorities in this State, the discharge of the plaintiff established

*prima facie* a want of probable cause. [Brant v. Higgins, 10 Mo. 728; Casperson v. Sproule, 39 Mo. 40; Fugate v. Millar, 109 Mo. 281.] In a former case in this court, probable cause was thus defined:

"In our opinion, that reasonable and probable cause which will relieve a prosecutor from liability, is a belief by him in the guilt of the accused, based upon circumstances sufficiently strong to induce such belief in the mind of a reasonable and cautious man." [Vansickle v. Brown, 68 Mo. loc. cit. 635.]

Something more than bare suspicion or surmise is necessary as a basis of defense against an action for damages in a case like the present one. [McGarry v. Railroad, 36 Mo. App. loc. cit. 347.]

In order to support such an action as that of the case at bar, two ingredients must come together: first, malice on the part of the prosecutor; second, the want of probable cause for the prosecution. Absent either of these, the action for malicious prosecution fails.

But where you establish proof of want of probable cause, there the jury may infer malice from the facts which go to make up such proof of such want. And where there is affirmative proof of the want of probable cause, then a defendant can be called on for his defense. [Casperson v. Sproule, supra; Hickam v. Griffin, 6 Mo. 37; Williams v. Vanmeter, 8 Mo. 339; Callahan v. Caffarata, 39 Mo. 136.] And it has been ruled that whenever a prosecution is shown to have been made without probable cause, there the burden is cast upon the defendant's shoulders to show want of malice. [Torsch v. Dell, 88 Md. 459; 19 Am. and Eng. Ency. Law (2 Ed.), 702.] In an action like this one the plaintiff was nonsuited and commenting on such nonsuit ANDREWS, J., observed:

"The court was not justified in nonsuiting the plaintiff if there was any evidence of the want of probable cause for causing his arrest and imprisonment, or unless the case upon the whole proof was such that a verdict for the plaintiff upon that

issue would have been set aside by the court as against evidence (Masten v. Deyo, 2 Wend. 424; Davis v. Hardy, 6 B. & C. 225). If the evidence on the part of plaintiff would have justified the jury in finding that the defendant acted without probable cause, then, although the proof on the part of the defendant tended to the opposite conclusion, the nonsuit was erroneously granted. There was no independent or conceded fact shown on the part of the defendant which, admitting the case made by the plaintiff, established the existence of probable cause. In considering the propriety of the nonsuit, the plaintiff is entitled to the concession that the facts existed as they appear in the evidence on his part, and upon these facts, aided by any fact favorable to the plaintiff proved by the defendant, the right of the court to nonsuit is to be determined." [Carl v. Ayers, 53 N. Y. 14.] But this inference which the jury may draw is one of *fact* and not of *law*. Proof of malice does not prove want of probable cause. "Malice, however, need not be proved by direct and positive testimony, but may be inferred from the facts which go to establish the want of probable cause; and this is all that is meant when it is said that malice may be inferred from want of probable cause." [Sharpe v. Johnston, 59 Mo. loc. cit. 575-6.]

Malice, like its congener, fraud, poses in such a multitude of attitudes, assumes such a variety of shapes, manifests itself in such "Protean transformations," that were direct proof of its presence required at a certain time and place, it could always establish the favorite defense of the elder Weller, an *alibi*.

For this cause it is that courts permit an infinite variety of circumstances and of circumstantial evidence to be adduced to show the cloven foot of malice. This thought will more fully be developed later on; but before reaching that point, it is well enough to quote, *en passant*, a description of malice as found in the familiar lines:

> "Damn with faint praise, assent with civil leer,
> And without sneering teach the rest to sneer."

Or, as the Book of Common Prayer hath it:

"Envy, malice and all uncharitableness."

But malice, in order to meet the requirements of an action like the present, need not be of such a pronounced type as the above quotations would indicate; a lighter variety of the species will answer, as later developments hereafter will disclose.    And it has frequently been ruled in this State that a defendant will be held responsible, not only for what facts he *knew* when he instituted the prosecution, but *for all other facts pertinent to such prosecution, which he could by due diligence have ascertained* prior to putting the machinery of the criminal law in motion. [Hill v. Palm, 38 Mo. 13 ; Sappington v. Watson, 50 Mo. 83; Sharpe v. Johnston, 59 Mo. 577; Ibid v. Ibid, 76 Mo. 660.]    And of course the obvious deduction from the just stated premise and the just cited and the accompanying and supporting authorities, give origin to this indubitable conclusion:

That any facts a defendant in a suit for malicious prosecution could by proper diligence have ascertained, prior to causing the arrest of the accused, will be *regarded* in the *same light,* and such defendant held equally responsible *as if he had actually ascertained such facts prior to such prosecution.*    And this question of probable cause is a mixed one of law and fact; the duty devolves on the jury to determine whether the circumstances are true or not; and on the court to determine whether they amount to probable cause.    "Regularly, the facts material to this question are first to be found by the jury, and the judge is then to decide, as a point of law, whether the facts, so found, established probable cause or not."    [2 G'l'f Evid. (14 Ed.), sec. 454; 1 Hilliard, Torts (4 Ed.), 481.]    But even where probable cause is shown by refusal of the magistrate to commit, still, all reasonable inferences of malice to be drawn therefrom, may be rebutted, to use the compendious statement of HOUGH, J., speaking for this

court in Sharpe v. Johnston, supra, "by showing that the prosecutor, after having fully informed himself as to all ascertainable facts bearing upon the guilt or innocence of the plaintiff, and having fully and fairly communicated the same to reputable counsel, instituted the prosecution under the opinion of such counsel that the plaintiff was legally subject to a criminal charge, and himself believed such advice to be correct and that the plaintiff was guilty. This is what is meant by consulting counsel, and instituting a prosecution in good faith." [76 Mo. loc. cit. 671.]

Bearing in mind the principles announced in the foregoing authorities, and quotations therefrom, let us examine the facts preserved in order to determine whether the trial court ruled correctly in taking the case from the jury. That probable cause was wholly lacking in this case is shown *prima facie* by the discharge of the accused. This alone would call on defendants for their defense; and with nothing introduced by them in evidence would authorize the matter to be submitted to the jury, under appropriate instructions, to determine whether they would, from the facts showing a want of probable cause, draw an inference of malice, and thus furnish the other ingredient necessary to make up the component parts of an action for malicious prosecution. And "if want of probable cause is made out, it is hardly possible that any difficulty can occur in regard to the question of malice." [Hamilton v. Smith, 39 Mich. loc. cit. 229, and cas. cit.] In one of the cases there cited, Mr. Justice STORY said:

"Malice may not only be presumed from the total absence of probable cause; but also from gross and culpable negligence in omitting to make suitable and reasonable inquiries." [Wiggin v. Coffin, 3 Story C. C. 1.]

Did defendants, or either of them, or those acting under them, make such suitable and reasonable inquiries?

Among such inquiries would be: One as to whether the accused was a person of good character in the community

where he had lived; for nearly a year in Springdale, Arkansas, and in Scott county, Missouri, where he had lived for twenty years.

No such inquiries were made nor attempted to be made either in Springdale, Arkansas, nor Scott county, Missouri, by any one of the hired or unhired attaches of the Mulholland Banking Company, or of the other defendants; Kinney, the detective for the railroad, never made any such inquiries, nor did he, of course, tell Mulholland he had made them, nor did Mulholland tell Sherman that Kinney had made such inquiries. Nor were such inquiries made by Hughes, the improvised officer, nor by his *confrere* Gorman, nor of Senator Marshall, nor of the station agent who pointed out Stubbs to Hughes, nor even of Stubbs himself; and such inquiries were *"ascertainable facts,"* having a direct and pertinent bearing on the question of probable cause.

Whenever the inquiry is, Is there probable cause for the institution of this prosecution? there the character or reputation of the proposed accused is an important factor in determining that point and answering that inquiry; and this is true whether such character, to-wit, reputation, be good or bad.    It needs scarcely be said that abundant authority supports this position.

Thus it is said by Chief Justice SHAW in Bacon v. Towne, 4 Cush. 217: "The same facts, which would raise a strong suspicion in the mind of a cautious and reasonable man, against a person of notoriously bad character for honesty and integrity, would make a slighter impression if they tended to throw a charge of guilt upon a man of good reputation."

Commenting on this statement of the law the Supreme Court of Massachusetts observes:

"In a suit of this kind, where the prosecution complained of was for an offense implying moral turpitude, the plaintiff's general reputation at the time of the prosecution, if the defendant was where he would be likely to know it, is

always involved in the issue, and the defendant may properly be permitted to show that it was bad.

"We see no good reason why the plaintiff should not be permitted, on the other hand, to show affirmatively that it was good. It is true that every one is presumed to be of good character until the contrary appears, and this presumption ordinarily saves the necessity of proof. Indeed, in civil cases, as a general rule, evidence of reputation is not competent upon a question as to liability for a particular act. But whenever character is in issue, the rule is different. One charged with a crime is not obliged to rest upon a presumption of good character. *In favorem libertatis,* he may prove the fact, if he can, by a weight of evidence far more effective than any mere presumption. A plaintiff in a suit for a malicious prosecution upon a criminal charge has the burden of proving that the prosecution was without probable cause. In defending against the prosecution he would have had the right to show his good reputation, although his character was not attacked otherwise than incidentally by the prosecution itself. The same incidental attack upon his character necessarily appears in the suit for the malicious prosecution. To prove that the attack was originally made without probable cause, we think he should be permitted to show his good reputation known to the defendant when the prosecution was commenced." [McIntire v. Levering, 148 Mass. 546.]

Such is the doctrine also of this court. [Gregory v. Chambers, 78 Mo. 294; Peck v. Chouteau, 91 Mo. 138; to the like effect see Woodworth v. Mills, 61 Wis. 44; Ross v. Innis, 35 Ill. 487; 14 Am. and Eng. Ency. Law, 59, and n.; Newell on Malic. Pros., 465, et seq.]

And though plaintiff did not live in the vicinity of the residence of defendants; in fact, lived when he returned to Scott county some three hundred miles distant from Kansas City, and when in Springdale, Arkansas, some two hundred miles perhaps distant, yet, as it was the bounden duty of de-

fendants to make all suitable and reasonable inquiries before instituting prosecution and especially as defendants' agent, Kinney, was sent down to Springdale, Arkansas, to look into the subject-matter of probable cause for such·prosecution, it was *his* duty as defendants' representative to make inquiries as to whether plaintiff was of good character or reputation; and his confessed failure to make such inquiries became the failure of defendants themselves.   [Hill v. Palm, supra, and other cas. therewith cited.]

It is true, Kinney stated he was not employed by Mulholland, that he *volunteered his services;* but Mulholland accepted those services, accepted his advice, and fully acted on that advice, and having done so, Mulholland is estopped to deny that Kinney was his agent.

There are other inquiries Kinney should have made and other facts he should have disclosed to his principals, Mulholland and the bank:   W. G. Thompson, whose name was forged on the pay check, was a co-employe of Kinney, a tie and labor inspector for the Atchison, Topeka & Santa Fe Railroad Company, and he found out when he went down to Springdale, that Thompson, at the place of his residence, Springdale, had been a partner of plaintiff, and yet he made no inquiries of Thompson either orally or by letter in regard to plaintiff, although he had the pay check with him, the indorsement on which had been forged and notwithstanding that Thompson had written Kinney from Springdale the following letter:

"I have just had a talk with the P. M. at this place and he tells me you have some trace of the parties who stole my checks and vouchers.   I have·no idea myself who the parties could be, as I am away from home most of my time.   My wife tells me the parties who cashed one of my checks at Kansas City had numerous letters and had my pass.   I must say, if this be true, he has stolen them or had some printed, for I

do not let any person handle my mail or passes. I could have had them stolen from my coat pocket some day in the hot weather while my coat was not in use. I never missed any of my letters or passes but they could have been used and I would not have missed them. Have hunted up all the letters pertaining to my lost checks and handed them to the P. M. I hope you will succeed in locating the thief. Anything I can do in this matter will be pleased to do so.

> "Yours truly,
> "W. G. THOMPSON."

Kinney said he made a report to Mulholland after he had made the trip to Springdale; that he had such letter at the time he made such report, and that such report was made about a week before plaintiff's arrest occurred (which occurred on April 23), but he could not remember whether he told Mulholland about the contents of the letter as to Thompson not missing any letters or passes or not. But inasmuch as Kinney was Mulholland's agent, in the absence of counter-vailing evidence it will be presumed that he communicated to his principal the contents of the letter. [Breckinridge v. Insurance Co., 87 Mo. loc. cit. 71, and cas. cit.] And, besides, notice to the agent is notice to the principal (Mechem on Agency, sec. 718); and the negligence of the agent in failing to communicate all the facts in the case of which he becomes possessed, becomes the negligence of the principal.

The reason the disclosure of the contents of the letter of Thompson to Kinney about not having lost any passes or letters was pertinent and important, was owing to the fact that Mulholland had testified that: "A young man presented a check there to be cashed—that was part of our business; it was for $75, an Atchison, Topeka & Santa Fe Railroad time check; I says that is a part of our business but we don't know you, if you will identify yourself we will cash the check for you;

Vol 168 mo—6.

He says, I am a stranger here, don't know of any one that knows me; but, he says, I have the envelope that contains the check and some passes and so forth, and he took out of his pocket a lot of envelopes of W. G. Thompson and some railroad passes; and it being such an unusual thing that letters and passes particularly should be carried by a man that did not own them, I instructed Mr. Barber to cash it."

And the disclosure of the letter's contents was pertinent further, because it contained a proffer by Thompson to Kinney, to assist the latter *"locating the thief;"* of which proffer Kinney never availed himself; nor did he avail himself of the further fact that he learned down at Springdale that Thompson then was a partner of plaintiff; and he already knew Thompson was a co-employe with him in the railroad company, and yet neither Kinney nor Mulholland instituted any inquiry of Thompson as to whether the signature indorsed on the pay check was that of plaintiff or not. And yet the testimony of Thompson shows in the clearest manner possible that had inquiry been made of him, he would have told Kinney or told Mulholland that that signature was not that of plaintiff, and would thus have prevented a groundless prosecution.

The failure, therefore, on the part of Mulholland and of his lieutenants to make inquiries of W. G. Thompson, plaintiff's partner, when inquiries were so easy, and ascertainment of the truth so sure, was therefore the failure to make suitable and reasonable inquiries, and therefore, under the precedent authorities, proof of gross and culpable negligence, and, therefore, proof of malice. [3 Story, supra.]

For, in order to show malice of the sort sufficient to maintain an action like that in the case at bar, it does not need to be proved that there was hatred or ill-will, malevolence, spite or revenge on the part of the defendant towards the plaintiff, (though such may actually exist and be proved); if the prosecution is reckless and unreasonable and instituted with a

Stubbs v. Mulholland.

gross disregard of the rights of the party to be arrested, then proof of these things proves malice, and malice being proven, is exclusively for the determination of the jury. [Hamilton v. Smith, supra; Mitchell v. Wall, 111 Mass. 492.]

Touching the duty of the jury in this regard, and speaking of a case where the court had usurped their functions, as in the case at bar, PARKE, J., spoke in the following terms: "But when there is no reasonable or probable cause, it is for the jury to infer malice from the facts proved. That is a question in all cases for their consideration; and it having in this instance been withdrawn from them, it is impossible to say whether they might or might not have come to the conclusion that the arrest was malicious. It was for them to decide it, and not for the judge." [Mitchell v. Jenkins, 5 B. & Ad. 588.]

3. But it is urged that as "Mulholland laid all the information he had before his general attorney, Sherman, and the latter advised the prosecution, this is of itself a complete defense." In the first place, it is not proven that Sherman was an attorney in good standing, "competent to give advice in legal matters." [Newell, Malic. Pros., 314; Murphy v. Larson, 77 Ill. loc. cit. 175.] In this State, where a license to practice is obtained almost for the asking, it by no means follows because a man has been licensed to practice law, that, therefore, he is qualified to give advice in a matter of such pith and moment as pertains to arresting a suspected man on a criminal charge; and this is especially the case where circumstances present themselves such as this record discloses.

In Roy v. Goings, 112 Ill. 656, in an action of like sort as this one, WALKER, J., said: "We are not prepared to hold that the mere fact that an attorney holding a commission as State's attorney, must be held to be an attorney in good standing for skill, prudence and fairness."

We take the same view of the law in this case. But even if Sherman, in addition to having been a regularly licensed

attorney and counselor, had also been shown to be "reputable in character, and considered in the community competent to give legal advice in all matters pertaining to the law" (Murphy v. Larson, 77 Ill. loc. cit. 175), still, this would avail defendants naught, because of the fact that Mulholland did not disclose to Sherman *all* the facts, as *he received them* from his agent, Kinney; because Mulholland swears that Kinney (when speaking of plaintiff and of his, Kinney's, trip down to Springdale, Arkansas), said, "he had been down there and *looked at the man himself* and made inquiry of the postmaster and banker there and showed this check to the banker and he said that looked very much like Stubbs's writing," while Kinney himself expressly swears *he did not see Stubbs, and did not tell Mulholland he had seen him* when down at Springdale, and in this statement Kinney is supported both by Hughes and Barber.

Then Mulholland, after Kinney had testified, amended his testimony by going back on the stand and swearing: "My recollection is one of those two things; he either told me he saw him or that my description answered the description of Mr. Stubbs; I am not clear as to the positive statement that he had seen Mr. Stubbs or whether he answered the description." And even if Sherman could be regarded as one fully qualified, etc., still, the defense incident to such advice being given, etc., can not be raised here, because of Mulholland's failure to use such reasonable and suitable diligence in ascertaining the facts in the case as would have resulted in materially altering the views of any one competent to advise upon the course to be pursued; for instance in failing, through his agents, to make inquiries as to Stubbs's good character. [Hill v. Palm, supra, loc. cit. 21.]

And as to Lowe, the prosecuting attorney, the like line of remark applies to him as to Sherman; and besides, Lowe was only seen for a moment, as he was about to go into the trial

of a case, and did not have the time to give the subject such consideration as is usually demanded.

4.   But in the sense above mentioned, malice is disclosed by this record in other ways than those already noted. Under statutory provisions heretofore cited, a warrant could not be executed outside of the county where issued, except one of those provisions contained in section 4204, Revised Statutes 1889, were complied with.   This section was section 1729, Revised Statutes 1879, was amended to its present shape as it now stands, by the Laws of 1867, p. 135, by adding to the statute (Gen. Stats. 1865, sec. 5, ch. 209, p. 833), the provision whereby a capias could be authenticated by adding the certificate and seal of the county clerk to the writ in the county of its issuance.   But the section as it formerly stood, containing a provision for authenticating the capias by indorsement, etc., has been on our statute books ever since 1855.   [R. S. 1855, p. 1161, sec. 5.]

And both provisions of the statute were passed upon by this court in State v. Dooley, 121 Mo. 591, and there held that a warrant not authenticated in one of the two ways mentioned, gave no authority to the officer holding it, to make an arrest in another county.   But this statute, though of such long standing, it seems was *wholly unknown* either to *court* or *counsel* in this case; and this appears from the character of the objections made by plaintiff's counsel to the admission in evidence of the appointment of Hughes as deputy constable, and the reply of the court to such objections, which were:

"The plaintiff objects to the introduction of said commission for the reason that it is incompetent and immaterial and not authorized by law; the constable had no right to give this man a commission to go outside of his county and serve a warrant.

"By the Court:   You don't dispute the right the constable had—had a right to be appointed deputy constable; let it go to the jury for what it is worth."

Because of neither of the provisions of the statute for authenticating the warrant having been observed, it was a mere nullity and Hughes had no more authority, under it, to arrest plaintiff, than had it been a *piece of blank paper*. Armed with such a warrant, Hughes had no more right to make the arrest of plaintiff, than if it were made outside of this State. This also is evidence of malice under the foregoing definitions. And Sherman, acting as Mulholland's general counsel, having drawn up the complaint, and advised the prosecution, it was his duty, if ignorant of the statute previously cited (as indeed it appears he was), to have consulted the statutes to see what was necessary to make the warrant valid in the county where the arrest was to occur. Such gross negligence in sending a warrant out, which lost all validity when it crossed the county line, to arrest a man three hundred miles away, drag him from his home and family and carry him across the State without a particle of authority in the law for so doing, is also evidence of malice; and Mulholland, having initiated the prosecution, is, of course, bound by the act of his subalterns, and their malice, to-wit, their gross negligence and disregard of the rights of plaintiff, became Mulholland's malice; and the like line of remark is applicable to the other defendants who made the unwarranted arrest.

But note further: Kinney had been down to Springdale, Arkansas, and what he saw, said and did, have already been related. On his return to Kansas City, Kinney made report to Mulholland, repeating what he had said and inquiries he had made, but even he did not regard what he had learned sufficient to arrest a man on, so advised if defendants thought they could positively identify the man, that they would send one of their number to Scott county with the discretionary power to arrest plaintiff or not to arrest plaintiff, as he should determine. On this point Kinney testified that on his return from Springdale he reported to defendant Mulholland as follows: "I am sufficiently satisfied of it that I feel some one

who knows him ought to be sent to Blodgett (Scott county) to look at him before we proceed any further with this investigation; I says, do your people say they can identify him? I says, I believe that is the proper thing to do, to send a man there to look at Mr. Stubbs; I says, if he is the man you can bring him back, if not, there is no harm done, we can look further. . . . Mr. Mulholland said he would have the matter taken up and have Mr. Hughes go to Blodgett to look at this man."

Mulholland pursued this advice, and at his instance, it seems, Barber was willing *to swear at a venture* that *Stubbs was the man who forged the name* of W. G. Thompson on the pay check; but *this was done* with the *distinct understanding* that Hughes, if, on going down to Blodgett, in Scott county, should be satisfied that Stubbs was *not* the party who forged Thompson's name, then the warrant *was not to be used; otherwise it was.*

So that Hughes, being armed with discretion to use the warrant or not, as he saw fit, to all intents and purposes turned the warrant into a *searchwarrant for a man!*

This course of conduct presents in and of itself sufficient evidence of malice of the sort requisite to maintain an action of this nature, and this, too, aside from the prima facie case previously made by plaintiff by establishing want of probable cause.

And this view of the grossly negligent, reckless and wanton course displayed in this prosecution is sharply accentuated by the circumstances that from that June day (June 13, 1896) when a stranger, five feet, seven or eight inches high, with dark complexion, a dark mustache and dressed like a railroad clerk, came into Mulholland's bank, stayed there about ten minutes, showed the check indorsed "W. G. Thompson," and letters directed to W. G. Thompson, and a railroad pass also bearing W. G. Thompson's name, over *ten months* had elapsed before Hughes assumed to arrest Stubbs as *that* man. But more than that, when Stubbs was taken on the worthless

warrant to Kansas City, Hughes made a promise to Senator Marshall (Stubbs's friend) that he would hold Stubbs at the Savoy Hotel until Senator Marshall could go out and get bond for Stubbs's release; but before Senator Marshall could return, though gone only a short time, Hughes violated his promise, and put Stubbs behind the bars.

This conduct, considering the fact that Hughes had *no authority at all to put Stubbs in jail,* also shows a reckless disregard of Stubbs's rights, which is wholly inconsistent with anything except malice as heretofore defined.

5. But recurring to the question of Sherman's advice, it is not seen how the advice of an attorney could avail anything here, or afford any shield of defense to his advisee, for the reason that the sole question to be solved in this case, was the *identity of the man who did the forgery.* Of course, however, on such a question, the advice of a *lawyer* was no better than that of a *layman.*

6. Should it be urged that if the warrant was void by reason of the fact that it was not properly authenticated, this reply can be made thereto: No such point was raised before the justice and plaintiff submitted to the jurisdiction of the magistrate, and he went on and adjudged the case and discharged plaintiff, and it certainly does not lie in the mouths of defendants to question that jurisdiction after they have invoked it. But even if the magistrate had no jurisdiction whatever, his judgment is just as good for the purposes of an action for malicious prosecution as if plenary jurisdiction existed.

On this point, Prof. Greenleaf observes:

"Nor is it material that the plaintiff was prosecuted by an insufficient process, or before a court not having jurisdiction of the matter; for a bad indictment may serve all the purposes of malice as well as a good one, and the injury to the party is not on that account less than if the process had been regular, and before a competent tribunal." [2 Glf. Evid. (14 Ed.), sec. 449.] Citing in support of this statement a number of

Stubbs v. Mulholland.

authorities: Stone v. Stevens, 12 Conn. 218; Morris v. Scott, 21 Wend. 281; Hays v. Younglove, 7 B. Mon. 545.

7.   The circuit court did not err in rejecting the testimony of Margolious, which testimony evidently and strongly tended to establish the entire innocence of plaintiff, by showing that another person, to-wit, one Mason, did the forgery in question, and was in the habit of doing such forgeries.   This testimony was properly rejected because the *innocence* of one who sues for malicious prosecution is not at all involved in such suit;   the real question being whether the prosecutor had probable cause for believing the accused guilty.   [Skidmore v. Bricker, 77 Ill. 164; Carl v. Ayers, 53 N. Y. loc. cit. 17, and cas. cit.]

8.   In conclusion, in cases of this sort, this court has always ruled that where there is evidence of malice or want of probable cause, there, under proper instructions, *those questions are for the jury; and it is error to refuse to submit them to the jury.*   [Moody v. Deutsch, 85 Mo. 237; Casperson v. Sproule, 39 Mo. 39; Hill v. Palm, 38 Mo. 13.]   In Casperson's case, this court reversed the judgment because the trial court, in a case of malicious prosecution, gave a peremptory instruction to find for defendants, and in Hill's case, this court ruled that the trial court properly refused, in such a case as this, to give an instruction to find for defendant; saying, that questions of malice and want of probable cause were for the jury.   Similar rulings are made elsewhere.   [13 Ency. of Pl. and Pr., 473; Hamilton v. Smith, and other cas. cit., supra; McLeod v. McLeod, 73 Ala. 42.]

For the error of giving the peremptory instruction aforesaid, the judgment will be reversed and the cause remanded. All concur.